595 S.E.2d 484

The **STATE**, Respondent,

v.

Martin **McINTOSH**, Petitioner.

No. 25808.

Supreme Court of South Carolina.

Heard Jan. 7, 2004.

Decided April 19, 2004.

Assistant Appellate Defender Robert M. Dudek of the South Carolina Office of Appellate Defense, of Columbia, and John M. Ervin, III, of Darlington, for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General S. Creighton Waters, all of Columbia; and Solicitor Jay E. Hodge, Jr., of Darlington, for Respondent.

Justice BURNETT:

Martin McIntosh (Petitioner) was convicted of murder, kidnapping, first degree criminal sexual conduct, and criminal conspiracy in a joint trial with five co-defendants.[1] The Court of Appeals' unpublished opinion affirmed Petitioner's convictions for murder, kidnapping, and criminal conspiracy and reversed the criminal sexual conduct conviction because there was no evidence Petitioner sexually assaulted Darlene Patterson (Victim), or acted in concert with others to sexually assault her. *State v. McIntosh*, Op. No.2001–UP–479 (S.C. Ct.App. filed November 8, 2001).

We granted the petition for a writ of certiorari to review the Court of Appeals' conclusion the prosecutor did not commit a *Doyle*[2] violation by questioning Petitioner about the fact he did not present his alibi defense to police after he was arrested and read his *Miranda*[3] rights. We reverse and remand for a new trial.

## FACTS

The body of Victim, 36, was found on November 24, 1994, partially submerged in a pond near Burnt Factory Road in

---

1. The six defendants jointly tried under the "hand of one, hand of all" theory were Petitioner, Alfonzo Staton, Leroy Staton, Ricky Stuckey, Jeffrey Walls, and Robert Graham. All faced the same four charges as Petitioner except Robert Graham, who was charged with everything except murder.

2. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

rural Marlboro County. Victim had been missing since November 12, 1994. Her ankles and hands had been bound with gray duct tape; the tape also had been wrapped tightly around her face and head.

The medical examiner testified Victim likely died of asphyxiation due to the tape around her face and head. Victim probably was dead before her body was placed in the pond, although the examiner could not rule out death by drowning. Further, the death likely occurred between November 12 and 20, 1994, and probably closer to November 12. The autopsy revealed no physical evidence that Victim had been sexually assaulted before her death, although the fact Victim was a mature woman and the body had partially decomposed made it more difficult to obtain such evidence if any existed.

Investigators examined items recovered from an abandoned house, where Victim had been held, and from the pond, including Victim's pocketbook, eyeglasses, an earring, and duct tape samples. However, investigators were unable to identify any physical or trace evidence (fingerprints, samples of hair, blood, semen, or the like) linking Petitioner or any other person to Victim's kidnapping and death. The State's case against Petitioner and other co-defendants consisted primarily of the testimony from co-defendants, Danny Davis and Bobby Ransom.

Davis and Ransom testified they observed Victim tied up and lying on a couch or bed during a cookout and party at two co-defendants' mobile home. Both accompanied several co-defendants on a trip to move Victim from the mobile home to an abandoned house. Ransom testified he was smoking marijuana and drinking creek liquor (a type of "white lightning" or moonshine) when several co-defendants arrived at his house the next night and asked him to join them on a trip back to the abandoned house. When he saw his visitors approaching, Ransom drank the remaining half of a pint of creek liquor he had been drinking so they would not ask him for any.

Davis and Ransom testified Petitioner and another co-defendant were waiting when they arrived at an abandoned house where Victim had been left the previous night. Several unidentified co-defendants carried Victim, still bound by tape, to the car and put her in the back seat beside Ransom.

Ransom testified he began "freaking out" when the "liquor hit [him]" and he begged them to stop Victim from "crying all over [him]," although she really was not. The eight co-defendants—including Davis, Ransom, and Petitioner—rode in a single car to a bridge, where unidentified co-defendants placed Victim's body in the pond.

Davis and Ransom were cross-examined at length about their extensive history of alcohol and substance abuse. Davis testified he suffered brain damage from a traumatic head injury 10 years earlier, as well as anxiety, sleeplessness, and depression. He was a victim of child abuse and had extensively abused alcohol and illegal drugs for years. He testified he drank heavily every day during November 1994. His alcohol use caused him to forget events and confuse things. During his two-year incarceration preceding the trial, Davis testified he saw nonexistent shadows, heard "a lot of [nonexistent] voices," and talked with imaginary friends. He was taking anti-psychotic and anti-depressant medications during his incarceration and the trial.

Ransom testified he had been paralyzed from the chest down since 1983. In November 1994, he had been on a drinking binge for some three years and eight or nine months. He often blacked out and suffered from memory loss. He had been hospitalized at psychiatric facilities three times before 1996 for abuse of alcohol and numerous drugs, including Valium, Xanax, sleeping pills, amphetamines, powder cocaine, crack cocaine, acid, marijuana, and "huffing" gasoline. He drank two quarts to a gallon of alcohol each week, including creek liquor.

Davis and Ransom testified on cross-examination they were good friends who grew up together. Davis often visited the reclusive Ransom at his house in 1994, and they saw one another frequently during a four-month period after the crime until their arrest. Police in March 1995 brought Ransom from another jail to see Davis in jail so Ransom could "confront" Davis about the crimes. The two confessed to police the same afternoon at the same location, and, for the first time, Ransom implicated Petitioner.

At his guilty plea prior to Petitioner's trial, Davis stated, "a lot of this stuff I can't quite remember, but my co-defendant

[Ransom] has—he's told me everything." While insisting he was trying to tell the truth at petitioner's trial, Davis testified he had changed his story "a lot of times," although not every time he talked to police during fifteen to twenty interviews. He "told [police] what they wanted to hear." In fact, he testified he no longer had an independent recollection of even being at the bridge that night, but based his trial testimony on some other source.

Petitioner, then 29, denied any involvement in the crimes, testifying he was in New York when they occurred. Petitioner testified that in 1994 he lived in Brooklyn, New York, where he was raised. Since his childhood, he often traveled to Marlboro County, where his father was raised, to visit family and friends.

Petitioner testified he stayed in Marlboro County, in September 1994, for a week or two with a friend, Butch Moore and then returned to New York. On November 2, 1994, he left New York with two friends and traveled to Marlboro County, again staying with Butch Moore. He returned to New York on November 7, 1994. To establish these dates, Petitioner entered into evidence a rental car receipt.[4] He also testified he attended his godfather's birthday party in New York on November 9, 1994. Petitioner tried to subpoena Moore to the trial, but the sheriff's office was unable to locate him.

Petitioner testified he again returned to Marlboro County by bus on the morning of November 23, 1994. He stayed several days with a cousin, but also visited the home and automobile repair shop of Joe Stuckey on Thanksgiving Day. In December 1994, Petitioner moved into the mobile home with co-defendants Ricky Stuckey and Robert Graham. He testified he had been to that mobile home—where Victim had been seen during the cookout and party—only once. Petitioner worked some at Joe Stuckey's shop and heard that Victim's body had been found, but testified he did not hear anyone say they were involved in the crimes.

In January 1995, while he was working at the shop, police examined Petitioner's identification but did not question him. In February 1995, Petitioner received a subpoena to appear

---

4. A friend rented the car with a credit card and Petitioner repaid him in cash. The rental agreement listed Petitioner as the driver.

before a federal grand jury investigating Victim's murder. Petitioner testified he returned to New York later that month. In April 1995, Petitioner returned to Columbia to testify before the grand jury. He was told he was not on the grand jury witness list and would not be called. Petitioner asked the secretary to call Marlboro County authorities because he had heard they had warrants for him. He was transported to Marlboro County, where he was arrested for murder and read his *Miranda* rights.

During direct examination, Petitioner testified as follows:

Q. And they read you your rights at that time?

A. Yes, sir.

Q. Told you you were under arrest?

A. Yes, sir.

Q. Did they ask you to make a statement?

A. Yes, sir.

Q. And what did you tell them?

A. I didn't want to make a statement about something I didn't know about.

Q. And at that point, you were arrested?

A. Yes, sir.

The following testimony occurred during cross-examination of Petitioner:

Q. Well, let's talk some more about your story here. Now, the truth is the first time that you have told anybody in law enforcement this story about your being in New York is today, isn't it?

A. Yes, sir.

Q. You ain't—for two-and-a-half years, you ain't never told this story.

Petitioner raised a *Doyle* objection, arguing the prosecutor was not allowed to question Petitioner about his post-arrest, post-*Miranda* silence or his failure to tell police he was in New York when the crimes occurred. He argued such questions violate his right to remain silent. The prosecutor contended Petitioner was in Marlboro County when the crimes occurred. Because Petitioner was asserting he was not in the county, the State was entitled to show that he never told

440

police that at any time. The trial judge overruled Petitioner's objection.

The cross-examination continued:

Q. Let's go back to where we stopped. What I was asking was the police talked to you, did they not?

A. That's according to when you're talking about.

Q. Well, let's talk about when you came to Columbia. You told your lawyer that you came down to Columbia?

A. Yes, sir.

Q. And the police wanted to talk to you?

A. Yes, sir.

Q. And you talked to them, agreed to talk to them, did you not?

A. Yes, sir.

Q. And you told them at that point in time, yeah, I don't know anything about this thing. I was in New York.

A. No, I never mentioned where I was. I just told them I didn't know what they were talking about and they asked me did I want to make a statement. I told them no. Then they asked—they kept asking me to make statements. I told them I wanted to speak to a lawyer.

Q. And when you told them you wanted to speak to a lawyer, they stopped, didn't they?

A. No, they continued to ask me questions.

Q. Well, did you tell them anything?

A. No.

Q. So that's my point. They stopped you at some point because you're here and you didn't tell them anything. Right?

A. Even after they talked to me—the same day I came to Marlboro County up from Columbia, that's the same day they appointed me a lawyer. They took me to Charlie Usher I believe his name is.

Q. Uh-huh.

A. And appointed a lawyer. But they still came to question me.

Following Petitioner's testimony, the judge instructed the jury:

[t]here is some testimony in this record regarding this individual of an alleged statement that he makes. In this connection, I tell you that a defendant has the absolute right to make a statement. If he elects to remain absolutely silent, that is his absolute constitutional right, and his silence may not be used against him. A defendant if he elects to make a statement may stop at any time and thereafter elect to remain silent. And if, should that occur, that silence cannot and must not be used against him in any way whatsoever. The fact that he elects initially or later, that fact cannot be used against any defendant and this defendant whatsoever.

In closing arguments, neither Petitioner nor the State mentioned Petitioner's testimony about what he did or did not tell police after his arrest. Petitioner was found guilty on all counts.[5] He was sentenced to life in prison for murder, thirty years consecutive for first-degree criminal sexual conduct, five years concurrent for criminal conspiracy.[6]

On appeal, Petitioner contended the State's cross-examination on his post-arrest, post-*Miranda* silence was a violation of due process pursuant to *Doyle*. The Court of Appeals held no *Doyle* violation occurred because Petitioner emphasized his cooperation with authorities in his direct examination, opening the door to the State's cross-examination. The Court of Appeals further concluded any error was harmless because it was cured by the trial court's charge following the solicitor's cross-examination.

## ISSUE

Did the Court of Appeals err in holding Petitioner, during direct examination, presented the defense he had cooperated with police, thus opening the door to otherwise impermissible cross-examination on his post-arrest, post-*Miranda* silence?

---

**5.** The jury found all co-defendants guilty on all counts, except Alfonzo Staton was found not guilty of first-degree CSC and Robert Graham (not charged with murder) was found not guilty of kidnapping or CSC.

**6.** No sentence was imposed for kidnapping pursuant to S.C.Code Ann. § 16-3-910 (1976).

442

## DISCUSSION

■ Petitioner contends the Court of Appeals erred in holding he "opened the door" to a *Doyle* violation. Petitioner argues he did not assert he cooperated with police, but only explained his travels between South Carolina and New York and his contacts with police in anticipation the prosecutor would argue he was fleeing from the crimes. Furthermore, Petitioner asserts the error was not harmless and was not cured by the judge's instruction immediately following the solicitor's cross-examination.

The United States Supreme Court has held the Due Process Clause of the Fourteenth Amendment is violated when a state prosecutor seeks to impeach a defendant's exculpatory story, told for the first time at the trial, by cross-examining him about his post-arrest silence after receiving the *Miranda* warnings. *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245, 49 L.Ed.2d at 98.

In *Doyle*, the state prosecutor presented evidence a police informant sold marijuana to defendants. The defendants testified they had been framed by the informant because they were not the sellers, but had intended to *buy* marijuana from the informant. Both were arrested within minutes of the alleged crime, were advised of their *Miranda* rights, and chose not to make any substantive post-arrest statements. During cross-examination at separate trials, the prosecutor questioned the defendants why they did not promptly assert their innocence after their arrest by telling police their exculpatory story. *Doyle*, 426 U.S. at 611–614, 96 S.Ct. at 2243–2244, 49 L.Ed.2d at 94–96.

In finding a due process violation, the Court rejected the States arguments such cross-examination was necessary to show a defendant may have concocted a false, exculpatory story after his arrest.

> Silence in the wake of these warnings may be nothing more than the arrestees exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who

receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested persons silence to be used to impeach an explanation subsequently offered at trial.

*Doyle*, 426 U.S. at 617–618, 96 S.Ct. at 2244–2245, 49 L.Ed.2d at 97–98 (citation omitted).

In limited exceptions to the general rule, the State may cross-examine a defendant about his post-arrest, post-*Miranda* silence when he offers an exculpatory story at trial and claims he told police the same version upon arrest. *Doyle*, 426 U.S. at 619 n. 11, 96 S.Ct. at 2245 n. 11, 49 L.Ed.2d at 98 n. 11. Similarly, *Doyle* does not bar cross-examination into prior inconsistent statements made by a defendant who voluntarily speaks after he has received the *Miranda* warnings. *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222, 226 (1980); *State v. Kimsey*, 320 S.C. 344, 465 S.E.2d 128 (Ct.App.1995).

The State may point out a defendant's silence prior to arrest, or his silence after arrest but prior to the giving of the *Miranda* warnings, in order to impeach the defendant's testimony at trial. Due process is not violated because "[s]uch silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty." *Brecht v. Abrahamson*, 507 U.S. 619, 628, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353, 366 (1993); *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).

The *Doyle* rule, as well as other principles prohibiting the prosecutor from using or commenting on a defendant's exercise of his constitutional rights, is "rooted in due process and the belief that justice is best served when a trial is fundamentally fair." *Edmond v. State*, 341 S.C. 340, 346, 534 S.E.2d 682, 685 (2000). "The obvious purpose is to try to prevent jurors from improperly inferring the accused is guilty simply because he exercised rights guaranteed him by the state and federal constitutions. Such an inference is constitutionally impermissible because the burden at all times remains upon the State to prove beyond a reasonable doubt every element of a crime with which the accused is charged." *Id.*

This case presents a clear *Doyle* violation. Petitioner voluntarily returned to South Carolina, as required by a federal subpoena, then voluntarily surrendered to Marlboro County authorities who had warrants for his arrest. He was arrested and read his *Miranda* rights. He chose not to speak to police, other than to deny knowledge of the crimes and ask for a lawyer.

At trial, the solicitor questioned Petitioner at length about his failure to present his alibi defense to police after he was arrested and given the *Miranda* warnings. The solicitor's questions were intended to focus the jury's attention on Petitioner's post-arrest silence as substantive evidence of his guilt, a prohibited tactic. *See State v. Smith*, 290 S.C. 393, 394–95, 350 S.E.2d 923, 924 (1986) (finding *Doyle* violation where solicitor asked psychiatrist if he knew defendant had refused to make a statement to police; granting new trial as it was not harmless error). The constitutionally impermissible inference the jury may have drawn from testimony about his post-arrest silence is Petitioner was guilty simply because he remained silent. *See Edmond*, 341 S.C. 340, 534 S.E.2d 682 (granting new trial to applicant in post-conviction relief action where testimony and prosecutor's closing improperly referred to defendant's exercise of right to remain silent and right to counsel); *see also State v. Reid*, 324 S.C. 74, 476 S.E.2d 695 (1996) (finding *Doyle* violation when officer, after arresting defendant and advising him of his *Miranda* rights, was asked whether defendant inquired about the condition of his passengers after an accident; granting new trial as it was not harmless error), *overruled on other grounds by State v. Watson*, 349 S.C. 372, 563 S.E.2d 336 (2002); *State v. Myers*, 301 S.C. 251, 258–259, 391 S.E.2d 551, 555 (1990) (finding an unpreserved *Doyle* violation but strongly cautioning solicitors against violating the prohibition by commenting on defendant's exercise of constitutional rights); *State v. Holliday*, 333 S.C. 332, 340, 509 S.E.2d 280, 284 (Ct.App.1998) (noting that solicitors have been repeatedly warned by appellate courts against violation of *Doyle* prohibition; and granting new trial as violation was not harmless error); *State v. Gray*, 304 S.C. 482, 405 S.E.2d 420 (Ct.App.1991) (finding *Doyle* violation where solicitor cross-examined defendant on failure to tell

police his exculpatory story; and granting new trial as violation was not harmless error).

■ The State contends Petitioner opened the door to any *Doyle* violation by trying to convince the jury he had fully cooperated with police. Therefore, the prosecutor properly was allowed to cross-examine Petitioner to show he had not cooperated with police, but in fact had remained silent.[7]

■ The State correctly explains other courts have held a defendant may open the door to cross-examination for impeachment purposes by testifying or creating the impression through his defense presentation he has cooperated with police when, in fact, he has not. Such cross-examination is permissible, as the Supreme Court recognized in *Doyle* by noting a prosecutor may challenge a defendant's contention he told his exculpatory story to police when he actually did not. *Doyle*, 426 U.S. at 619 n. 11, 96 S.Ct. at 2245 n. 11, 49 L.Ed.2d at 98 n. 11. *See e.g., Kibbe v. DuBois*, 269 F.3d 26, 34–35 (1st Cir.2001) (explaining *Doyle* is not violated when defendant opens the door to cross-examination on post-arrest silence by testifying on direct he told police what had happened and lawyer stated the same in opening and closing); *United States v. Reveles*, 190 F.3d 678, 684–685 (5th Cir.1999) (finding no *Doyle* violation because "[w]hen a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation"); *Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir.1996) (finding no *Doyle* violation because "prohibition against reference to post-arrest silence does not allow the defendant to freely and falsely create the impression that he has cooperated with police when, in fact, he has not"); *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651 (7th Cir.1983) (finding no *Doyle* violation where defendant opened the door to cross-examination on post-arrest silence by testifying on direct he did not make a statement to

---

7. The State also argues the Court should find Petitioner's argument unpreserved because his lawyer did not object after the first allegedly improper question. Petitioner's lawyer objected after the prosecutor's second question. The State's argument is without merit. *See State v. Gray*, 304 S.C. 482, 405 S.E.2d 420 (Ct.App.1991) (finding *Doyle* objection was sufficiently contemporaneous where defendant's lawyer objected after second improper question).

the sheriff because it could be used against him and, since he was on parole, he did not think the sheriff would believe him); *Wentz v. State*, 766 N.E.2d 351, 362 (Ind.2002) (finding no *Doyle* violation because defendant opened the door to cross-examination on post-arrest silence by testifying on redirect he had answered all the police's questions).

In the State's view, Petitioner claimed he cooperated with police and thus opened the door to an otherwise improper line of questioning by (1) testifying on direct examination he voluntarily returned to South Carolina and he did not give a statement to police upon his arrest; (2) inferring to the jury he had told his alibi story to authorities by testifying he was staying with Butch Moore when the crimes occurred, but the sheriff had not been able to serve a subpoena on Moore shortly before or during the trial;[8] (3) inferring to the jury he really wanted to speak to police but they did not want to talk to him, as they only once asked for his identification and later served a federal subpoena on him; and (4) testifying on cross-examination before the challenged inquiry "if I knew anything about any of this, I would have been talking to the police. I would have talked to the people in Columbia a long time ago."

We conclude Petitioner did not open the door to any *Doyle* violation. Petitioner did not, explicitly or implicitly, assert he cooperated with police. The focus of Petitioner's defense, as revealed by his actions before his arrest and at his arrest, as well as his trial testimony, was he was not present when the crimes occurred, knew nothing about the crimes or who was involved, and so had nothing to tell police.

In an analogous case, a defendant made no post-arrest statement to police and asserted an alibi defense for the first time at trial in an armed robbery case in which "[t]here was no dispute that the crimes charged had been committed by someone." *State v. Garcia*, 118 N.M. 773, 887 P.2d 767 (Ct.App.1994). The prosecutor questioned the defendant why he did not mention his alibi defense to a police detective in the hour he spent traveling with the detective after his arrest.

---

8. Petitioner testified he left South Carolina on November 7, 1994, to return to New York, and returned to South Carolina on November 23, 1994. Victim apparently was kidnapped on November 12, 1994, and murdered a day or two later. Thus, Petitioner testified he was in New York not staying with Moore when the crimes occurred.

The New Mexico court concluded the prosecutor's questions violated due process, reasoning a defendant who chooses to remain silent about his alibi defense until trial does not open the door to this line of questioning. "[T]here is nothing to impeach until the defense has come forward with an explanation. By the State's reasoning, offering an explanation [for the first time at trial] would always open the door for the impeachment." Endorsing the State's door-opening argument in such a case is not appropriate because it "would completely undercut *Doyle.*" *Garcia,* 887 P.2d at 772.

We further conclude the trial error in this case was not harmless; nor was it cured by the judge's instruction. When a *Doyle* violation occurs, the conviction still may be upheld when a review of the entire record establishes beyond a reasonable doubt the error was harmless. "To be harmless, the record must establish the reference to the defendant's right to silence was a single reference, which was not repeated or alluded to; the solicitor did not tie the defendant's silence directly to his exculpatory story; the exculpatory story was totally implausible; and the evidence of guilt was overwhelming." *State v. Pickens,* 320 S.C. 528, 530–531, 466 S.E.2d 364, 366 (1996). "An instruction to disregard incompetent evidence is usually deemed to have cured the error unless on the facts of the particular case it is probable that, notwithstanding the instruction, the accused was prejudiced." *State v. Smith,* 290 S.C. 393, 395, 350 S.E.2d 923, 924 (1986).

In this case, the prosecutor questioned Petitioner thoroughly about his post-arrest, post-*Miranda* silence, asking him no less than ten questions aimed at showing Petitioner never presented his alibi defense to police. The solicitor tied Petitioner's silence directly to his alibi defense, asking him, for example, "[n]ow, the truth is the first time that you have told anybody in law enforcement this story about your being in New York is today, isn't it?" and "[y]ou ain't—for two-and-a-half years, you ain't never told this story."

Petitioner's story was not totally implausible. He had traveled between South Carolina and New York since he was a child. He had documentary proof (the rental car receipt) he had left South Carolina before the crimes occurred. His irregular arrivals and departures, along with the fact he

moved into the co-defendants' mobile home after the crimes occurred and lived there for some two months, may have caused the State's two key witnesses to be unable to accurately recall whether they saw him at the crime scene or just living at the mobile home in following weeks.

Finally, the evidence against Petitioner was not overwhelming. No physical or trace evidence was introduced linking Petitioner to the crimes. The case against Petitioner consisted primarily of the testimony of two witnesses, Davis and Ransom. Both testified about their extensive history of alcohol and substance abuse, as well as their memory lapses, before and during the period the crimes occurred. Both Davis and Ransom were interviewed by police numerous times and faced the death penalty until they began cooperating. The testimony of these key witnesses cannot be deemed overwhelming, particularly when viewed in light of the likely impact the State's improper questioning had on jurors' perception of Petitioner's credibility. *See State v. Smith,* 309 S.C. 442, 447, 424 S.E.2d 496, 499 (1992) (admission of testimony about prior drug use which likely destroyed defendant's credibility, in a case where witness credibility was crucial to jury's determination of who and what to believe, could not be deemed harmless error); *State v. Reeves,* 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990) ("[e]rror which substantially damages the defendants credibility cannot be held harmless where such credibility is essential to his defense).

## CONCLUSION

We reverse the Court of Appeals concluding (1) the prosecutor's questions violated Petitioner's right to due process as established in *Doyle;* (2) Petitioner did not in his testimony or the presentation of his defense attempt to create the impression that he had cooperated with police, and therefore did not open the door to a *Doyle* violation; and (3) the violation under these facts and circumstances was not harmless error and was not cured by the judge's cautionary instruction. We reverse Petitioner's convictions and remand for a new trial.

**REVERSED.**

TOAL, C.J., WALLER, PLEICONES, JJ., and Acting Justice THOMAS L. HUGHSTON, JR., concur.