613 S.E.2d 386

**The STATE, Respondent,**

**v.**

**Derringer L. YOUNG, Appellant.**

**No. 3983.**

Court of Appeals of South Carolina.

Heard Dec. 7, 2004.

Decided May 2, 2005.

Rehearing Denied August 26, 2005.

478

Acting Chief Attorney Joseph L. Savitz, III, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General David Spencer, all of Columbia; and Solicitor Ralph E. Hoisington, of Charleston, for Respondent.

ANDERSON, J.:

Derringer L. Young was charged with possession with intent to distribute crack cocaine, criminal sexual conduct in the first degree, and kidnapping. He pled guilty to the possession charge, and a jury convicted him of kidnapping, and of assault and battery of a high and aggravated nature as a lesser included offense of criminal sexual conduct. On appeal, Young argues (1) the trial judge erred by admitting evidence of his prior convictions for criminal sexual conduct and criminal domestic violence, and (2) the State improperly injected race as a motive. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Young was accused of kidnapping and raping the victim in the early morning hours of September 9, 2001, in downtown Charleston, South Carolina. Following dinner the previous evening, the victim drove downtown by herself to purchase crack cocaine. She testified she had done this numerous times before. The victim bought crack cocaine on this particular night from Young because he "looked familiar to [her], like [she] had bought from him before." After purchasing crack

from Young, the victim smoked it and asked to buy more. He indicated he needed a ride to get more crack, and she agreed to drive him. Young became enraged when the victim informed Young she wanted more crack so that she could return home and smoke it with her husband. She alleges Young hit her, forced his way into the driver's seat, drove to a secluded area, and raped her.

At approximately nine o'clock a.m., Corporal Sherry Niblock spotted the victim's car parked and observed the victim fully reclined in the passenger seat with Young on top of her. When Young saw Niblock, he jumped into the driver's seat and sped away in the vehicle. Niblock testified that the victim looked exhausted, had been crying, and had bruises on her neck. Niblock stated the victim "rolled her head over at [her] and said, 'Would you please just help me?'" Niblock dispatched information about the vehicle, which Officer Peter Hall located approximately ten minutes later. According to Hall, the victim looked exhausted and had marks on her neck and wrists. A rape exam was inconclusive as to whether sexual assault had occurred.

Young testified at trial and gave a much different account of his encounter with the victim on the night in question. According to Young, the victim was one of his customers. He stated the two of them drove around all night smoking crack and talking.

Throughout his testimony, Young conveyed his concernment for the victim's safety. He averred that he had previously sold drugs to the victim and on the night of the alleged rape, she returned to the place they had first met and asked for him. Young proclaimed he sold her $80 worth of crack, which the two of them smoked. After consuming the crack, the victim asked for more. Young recounted:

A. Right after that she said she aint had anymore money. So I said, well, I'll get the drugs for you. Just whenever, you know, you come back down the area, bring the money to me.

Now I was able to trust her, because like I say before, once a person deal with you and we use the word and the term keep it real. She kept it real.

And I was able to trust [the victim]. So any time that she would come down—**and then I also told some people, said, If she come down, I don't want nobody talking to her. I don't want nobody selling her nothing. I don't want nobody bothering her. Leave her be whenever she come, because she's coming to me.**

. . . .

Q. Well, tell me what happened after she asked you for some more drugs. What did y'all do?

A. Well, we get the drugs.

Q. How did you get the drugs?

A. Well, I was getting all the drugs fronted to me by some people that I know.

Q. Okay. And was she paying you for them?

A. Well, she aint had no more money.

. . . .

Any time we would run low [on drugs], [the victim] would feel that, you know, she have to have more than what she got.

So I like, Well, ... you know you got to get back on the road soon, you know?

So she like, I'm going to be all right. I'm going to be all right.

**I said, But then I don't want nothing to happen to you, because people saw, you know, me and you, you know, riding around together.** And me and you were riding around for—

. . . .

**And I do remember saying, ... you got to get back on the road soon. You know, because you know, I don't want nothing to happen to you down here, because people saw me and you together, you know?**

So she said, I'm going to be all right. I'm going to be all right.

So I said, Okay. **I said, Come on then, take me back on the block and I'll go and get something else for you.**

. . . .

So we park on Sheppard Street. **I said, ... lock your windows. Up your windows. Don't talk to nobody. I mean nobody.**

So she said, Okay. I said, Just give me five minutes and I'll be right back.

So I got out of the vehicle....

....

I got the drugs and I came back. This little fellow by the nickname of Daddy, which is his real nick—his real name is Antwan Grant.

So when I came up, I saw him and [the victim] talking. I said, Yo, what are you doing to the vehicle? You know I don't play that with nobody around here.

He said, Man, I was coming down the street, man, and I saw this white girl in this vehicle and I thought something was wrong. I know for a fact, dog, you always in this area.

So she probably thought he was spying on me or something.

**I said, No, she with me, man.**

So at that time I didn't know [the victim] and him had already done spoke.

So she said, Let me hold on him for a minute, Duke.

I said, ... you aint come down here to talk to nobody, you come down here to deal with me; not nobody else.

So at that time I was kind of like—can I continue?

Q. Yes.

A. I was like getting angry with [the victim] because I was like, wait a minute. You come to deal with me, not nobody else. So if something happened to you, everybody going to look at me; not this man right here....

(Emphasis added).

At this point, Grant entered the car with Young and the victim. According to Young, Grant directed the victim to drive to a certain location and park the vehicle. Grant then asked to be alone with the victim. Young, on direct examination, described his reaction:

He said, because I need to holler at her, dog.

I said, Yo, you aint got no words for her, period.

482

**She said, it's all right. You're with me Duke, so I aint worried about nothing.**

. . . .

So [the victim] said Step out a minute, let me holler at him.

**So I look at her like—now I'm getting real angry with [the victim], because, first of all, she don't have to belittle herself like that, because like I said before, I'm giving you all these drugs. I haven't asked you for nothing but keep it real.** So then—

Q. When you say haven't asked for nothing, what do you mean?

A. I have asked her for no sex. . . .

. . . .

Q. When you said you don't have to belittle yourself like this, what do you mean?

A. Well, what I was saying by belittling herself, **she don't have to play herself to a low standing just to get what she want when she got somebody who going to get it for her.**

. . . .

A. —I got out of the vehicle. I got out the passenger seat. When I got out the passenger seat, Daddy got out the back seat and got in the front seat. I went and I stood to the back part of the vehicle.

. . . .

. . . I thought that all they was going to do was talk and trade drugs.

So when I went back to the passenger side, now I see [the victim] performing oral sex on Daddy. And when [the victim] is performing oral sex on Daddy, I knocked on the window, and I did like this right here to her. (Demonstrating.)

So I walked back to the back part of the vehicle. When I walked back to the back part of the vehicle, that's when I said, no, **I aint going to let this go down like this right here,** because, see, I'm the type of person that I get angry when there's something going on that I don't like. So I walk back—

Q. Mr. Young, just talk about what happened.

A. Yes, sir.

. . . .

Q. Did you stay and watch what happened?

A. I stayed to the back of the vehicle, because just like I say, **I didn't want to leave her.**

(Emphasis added).

Grant left their company, and Young and the victim continued to drive around together getting high. Young testified that around five o'clock a.m. the victim expressed she was not ready to return home.

A. And at this time we sat right there by the East Side Community Center and that's when she said, I need to talk to you about something. She said, I aint ready to go. Not yet.

I said, okay. What's up? **So she like start crying. So I said . . . look, I aint angry no more.**

**Because, see, like I told my lawyer, I hate to see a female cry.**

. . . .

**So I said, . . . I aint angry at you no more. . . .**

**. . . I'm going to make sure you all right, you know?**

(Emphasis added).

Young then averred:

A. So at this time [the victim] was like, I still want to do something for you.

I said, okay. What?

So she said, I want to have oral sex with you.

So I said . . . if that going to get you to chill out, quit crying and all that, do what you got to do.

So at this time when [the victim] went down on me, **I was feeling bad.**

**I said, no, . . . stop. I said, stop.**

**I said, because I can't get down like this right here. If I going to argue at you behind us then I'll be just as**

**wrong if I allowed myself to let you go through this right here.**

(Emphasis added).

Following Young's direct examination the State argued that he opened the door to admission of his prior convictions for criminal sexual conduct and criminal domestic violence. The trial judge found Young had placed a character trait in issue and allowed the State to impeach him with a 1994 conviction for criminal sexual conduct in the third degree and a 1993 conviction for criminal domestic violence.

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001); *State v. Wood*, 362 S.C. 520, 608 S.E.2d 435 (Ct.App. 2004); *State v. Mattison*, 352 S.C. 577, 575 S.E.2d 852 (Ct. App.2003). This Court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Quattlebaum*, 338 S.C. 441, 527 S.E.2d 105 (2000). This same standard of review applies to preliminary factual findings in determining the admissibility of certain evidence in criminal cases. *Wilson*, 345 S.C. at 6, 545 S.E.2d at 829; *State v. Bowie*, 360 S.C. 210, 600 S.E.2d 112 (Ct.App.2004). The appellate court does not re-evaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial judge's ruling is supported by any evidence. *Mattison*, 352 S.C. at 583, 575 S.E.2d at 855.

## LAW/ANALYSIS

### I. Admissibility of Prior Convictions

Generally, evidence of a defendant's character is not admissible to show a propensity to act in conformity therewith; however, it is well settled that if a defendant places his character in issue, the State may offer evidence of the defendant's bad character. *See* Rule 404(a)(1), SCRE ("Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) Character of Accused. Evi-

dence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same[.]").

The jurisprudence of this State contains a plethora of enlightening cases establishing and explicating the proposition that a defendant may open the door to what would otherwise be improper evidence. For instance, *State v. Allen*, 266 S.C. 468, 224 S.E.2d 881 (1976), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991), although it never uses the open door language, is often cited for the door-opening doctrine. *See, e.g., State v. Major*, 301 S.C. 181, 391 S.E.2d 235 (1990); *State v. Plath*, 281 S.C. 1, 313 S.E.2d 619 (1984); *State v. Doby*, 273 S.C. 704, 258 S.E.2d 896 (1979). In *Allen*, the defendant, who was accused of kidnapping and murder, offered four good-character witnesses. He then took the stand and described his past criminal activities. The *Allen* court explained, "The gist of his testimony was to show to the jury that, though he was admittedly an habitual criminal, none of his nefarious acts were committed with the use of force, so as to harm any person." 266 S.C. at 481, 224 S.E.2d at 886. The court observed: "By presenting character witnesses, defendant placed his good character and general reputation in issue; by submitting evidence of his criminal past, with the admitted purpose of establishing his propensity for non-violence, defendant placed this specific character trait in issue." *Id.* at 481–82, 224 S.E.2d at 886.

On cross-examination, the solicitor questioned Allen about his convictions as well as prior acts of misconduct for which he had not been convicted. Allen argued that inquiry into the wrongful acts was error. The court disagreed:

We recognize certain exceptions to the general rule that an accused's bad character may not be offered against him by the State. One exception is where the accused takes the stand and thus becomes subject to impeachment, like any other witness. The accused may thus be cross-examined about any of his past transactions tending to affect his credibility. *Taylor v. State*, 258 S.C. 369, 188 S.E.2d 850 (1972). Secondly, where the accused offers evidence of his good character, thereby putting his reputation in issue, he may be cross-examined on particular acts which manifestly bear reference to the trait of character covered by the

charge in the indictment. *State v. Gibert,* 196 S.C. 306, 13 S.E.2d 451 (1941).

. . . .

Thus, the solicitor had the right to cross-examine the defendant with respect to conduct which reflected on his credibility as a witness and on the specific character trait involved in the crime charged.

*Id.* at 482–83, 224 S.E.2d at 886.

In *State v. Stroman,* 281 S.C. 508, 316 S.E.2d 395 (1984), the defendant was convicted of four counts of murder and five counts of kidnapping, as well as safecracking, assault and battery with intent to kill, armed robbery, and contempt of court. On appeal, he challenged the propriety of allowing the State to introduce testimony indicating Stroman had committed prior armed robberies. Frank McDowell, an accomplice in the crimes, testified for the State. On cross-examination, the defense asked McDowell whether he had ever broken into other homes for money. McDowell admitted that he had. On redirect, the State sought to further question McDowell as to two of the incidents in which Stroman had participated as well. Over the defense's objection, "The trial judge ruled the 'door had been opened' to inquiry into appellant's participation in 'any crime that included a breaking into a building' or 'armed robbery or some stealing of money.'" *Id.* at 513, 316 S.E.2d at 399. The supreme court agreed: "Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though [the] latter evidence would be incompetent or irrelevant had it been offered initially." *Id.* (alterations in original) (citing *State v. Albert,* 303 N.C. 173, 277 S.E.2d 439, 441 (1981)). The court held:

Once appellant's counsel initiated the questioning concerning McDowell's prior acts of theft, the State was free to question him as to the details of any prior crime involving the stealing of money. The scope of redirect rests in the discretion of the trial court. *State v. Tyner,* 273 S.C. 646, 258 S.E.2d 559 (1979). We hold the trial court properly admitted McDowell's testimony.

281 S.C. at 513, 316 S.E.2d at 399.

In *State v. Doby,* 273 S.C. 704, 258 S.E.2d 896 (1979), the defendant was convicted of murder. The State was allowed to

elicit evidence of Doby's prior convictions for trespassing in women's restrooms. The South Carolina Supreme Court employed the open-door doctrine in finding the admission proper:

> Appellant next asserts error in allowing the solicitor to cross examine him and his psychiatric witnesses about appellant's two prior convictions for trespassing in public women's restrooms, and in admitting a note he had left in one of those restrooms into evidence. We hold that appellant opened the door to this cross examination by direct testimony regarding his passive character and lack of mature sexual desires.

*Id.* at 710, 258 S.E.2d at 899–900 (citations omitted).

*State v. Major,* 301 S.C. 181, 391 S.E.2d 235 (1990), is an edifying opinion. Major was convicted of distribution of crack cocaine. The trial judge allowed the State to introduce a prior conviction for simple possession of cocaine after Major denied having ever used the drug. The court found that Major had made a "clear attempt . . . to communicate to the jury that he [wa]s not the sort of individual who would become involved in the drug trade." Therefore, "Having introduced evidence of his own good character on the issue of involvement in drugs, Major thereby became subject to cross-examination on that assertion." *Id.* at 185–86, 391 S.E.2d at 238.

*State v. Robinson,* 305 S.C. 469, 409 S.E.2d 404 (1991), is another demonstration of the supreme court's utilization of the door-opening theory. Robinson allegedly hired members of El Rukn, a Chicago-based gang, to murder the victim. The disputed evidence emanated from the solicitor's questioning Henry Harris, a member of El Rukn. The court explained: "Harris testified that in the 1980's he was in charge of drug operations for the organization. He was subsequently asked when he first became acquainted with appellant and he answered "'83 or '84.'" *Id.* at 474, 409 S.E.2d at 408. Appellant objected and moved for a mistrial on the ground Harris' testimony linked appellant to drug dealing. After finding that the testimony did not imply appellant was involved in drug dealing, the court addressed the open-door doctrine:

> Further, appellant was the first to bring out the El Rukn's involvement in drug dealing. A previous witness, gang member Eugene Hunter, testified appellant was a friend of

Jeff Fort, the head of El Rukns, and was assisting the El Rukns in establishing a legitimate business. On cross-examination, appellant elicited testimony from Hunter that El Rukns were involved in drug dealing. Since appellant opened the door to this evidence, he cannot complain of prejudice from its admission.

*Id.* at 474, 409 S.E.2d at 408 (citation omitted).

*State v. Beam,* 336 S.C. 45, 518 S.E.2d 297 (Ct.App.1999), involved a conviction of transfer of recorded sounds for pirating videotapes. The defense questioned expert Beasley whether he had performed a particular type of test, a switch point test, in order to determine the authenticity of allegedly pirated videos. Beasley had not performed the test. The defense then questioned expert Bowley about the switch point test. Although Bowley had not conducted the test, he stated that he could arrange to perform the test in court. Over the defense's objection, Bowley was allowed to perform the test on two tapes, both of which he determined were counterfeits. This Court concluded:

> Beam cannot complain about the admission of evidence where he opened the door to the evidence. *See State v. Robinson,* 305 S.C. 469, 409 S.E.2d 404 (1991) (where appellant opened door to evidence, he cannot complain of prejudice from its admission); *State v. Sullivan,* 277 S.C. 35, 282 S.E.2d 838 (1981) (appellant cannot complain of prejudice from admission of evidence if he opened the door to its admission). Further, when a party introduces evidence about a particular matter, the other party is entitled to explain it or rebut it, even if the latter evidence would have been incompetent or irrelevant had it been offered initially. *State v. Stroman,* 281 S.C. 508, 316 S.E.2d 395 (1984). A party may not complain of error caused by his own conduct. *Id.*

336 S.C. at 53, 518 S.E.2d at 301.

In *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998), the trial court allowed the State to introduce the defendant's prior criminal domestic violence convictions due to his opening the door to such evidence. The defendant stipulated he killed his wife by strangling her with a t-shirt. However, he denied the killing was murder. Taylor took the stand and stated that

"things had kind of gotten rough for us the last couple of years...." *Id.* at 172, 508 S.E.2d at 877. On cross-examination, the State brought out an eight-year-old conviction for criminal domestic violence to rebut Taylor's assertion that things were rough "the last couple of years."

Taylor contended the judge erred by allowing the solicitor to impeach him with a prior conviction for criminal domestic violence. The court disagreed and noted:

An "accused may be cross-examined as to all matters which he himself has brought up on direct examination." 98 C.J.S. *Witnesses* § 515 at 439 (1957); *State v. Allen,* 266 S.C. 468, 224 S.E.2d 881 (1976), *citing* 98 C.J.S. *Witnesses* § 378 at 134–135 ("[a]s a general rule, any matter is proper subject of cross-examination which is responsive to testimony given on direct examination, or which is material or relevant thereto, and which tends to elucidate, modify, explain, contradict or rebut testimony given in chief by the witness."). The cross-examination of matters which were addressed in direct-examination is not objectionable, even if the answers affect a witness' credibility and character. 98 C.J.S. *Witnesses* § 378.

*Id.* at 174–75, 508 S.E.2d at 878 (footnote omitted).

Further, the *Taylor* court found:

[T]his testimony did not place appellant's character in issue. However, because appellant "opened the door" about his relationship with his wife, the solicitor was entitled to cross-examine him about the relationship, even if the responses brought out appellant's prior criminal domestic violence conviction.

*Id.* at 175, 508 S.E.2d at 878 (footnote and citations omitted).

The doctrine of opening the door was used by this Court in *State v. Knighton,* 334 S.C. 125, 512 S.E.2d 117 (Ct.App.1999). Knighton was arrested and convicted for driving under the influence. Knighton testified on direct examination that Charleston and Greenville law enforcement made videotaping tests available to DUI arrestees, whereas his request for a videotape from Orangeburg was refused because they lacked the equipment. The solicitor questioned Knighton on how he knew the other counties used video equipment. The trial

judge instructed the witness not to answer the question, and Knighton moved for a mistrial. The court held:

Though there was the potential for prejudicial testimony to have been submitted to the jury, the trial judge prevented any prejudice by instructing Knighton not to answer the solicitor's question. Further, appellant himself opened the door to this inference by testifying about his knowledge of videotaping offered to DUI suspects in two other counties. Accordingly, we find no abuse of discretion.

*Id.* at 134, 512 S.E.2d at 122.

In *State v. Dunlap*, 353 S.C. 539, 579 S.E.2d 318 (2003), Dunlap was convicted for distribution of crack cocaine. During opening statements, counsel for Dunlap professed that the defendant had "been in trouble with the law" and was "hooked on crack and had a problem with it," but "never sold it." *Id.* at 541, 579 S.E.2d at 319. Based on these statements, the State was able to introduce Dunlap's prior convictions for conspiracy to possess crack cocaine with intent to distribute; distribution of an imitation drug; simple possession of marijuana; and shoplifting. The *Dunlap* court explicated:

The opening statement created the impression that petitioner had no prior connection to the sale of narcotics. In reality, petitioner was not a mere drug user, but an individual who sought to 'elevate' his status to that of a drug dealer.... We therefore agree ... that petitioner's counsel opened the door to the introduction of evidence rebutting the contention that petitioner was merely an addict.

*Id.* at 541, 579 S.E.2d at 319 (citations omitted).

Moreover, the court found an analysis under Rule 609, SCRE, unnecessary:

Because we find that counsel opened the door to the admission of petitioner's prior drug record, we need not reach the issue whether these convictions were admissible to impeach petitioner's credibility under Rule 609, [SCRE].

*Id.* at 542, 579 S.E.2d at 320.

In the case of *State v. Curtis*, 356 S.C. 622, 591 S.E.2d 600 (2004), Curtis was convicted of two counts of the sale of urine with the intent to defraud a drug or alcohol test. At trial, both Curtis and his webmaster testified that Curtis's website

did not contain pornographic material, or links to websites containing pornographic material. On cross-examination, the State questioned Curtis about pornographic links and demonstrated, in court, how pornography indirectly could be accessed through links on pages linked to Curtis's page. Curtis argued that this inquiry was irrelevant and misleading. However, the court held: "Given that both Curtis and Turner maintained that PPS did not allow pornographic materials or links on the website, it is patent that they opened the door to this line of inquiry." *Id.* at 632, 591 S.E.2d at 605 (citation omitted).

*State v. McIntosh,* 358 S.C. 432, 595 S.E.2d 484 (2004), discusses the door-opening doctrine in the context of a *Doyle* violation, ultimately concluding the doctrine did not apply to the facts of *McIntosh.* At issue was the solicitor's questioning the defendant "at length about his failure to present his alibi defense to police after he was arrested and given the *Miranda* warnings." *Id.* at 444, 595 S.E.2d at 490. The court observed:

> The State correctly explains other courts have held a defendant may open the door to cross-examination for impeachment purposes by testifying or creating the impression through his defense presentation he has cooperated with police when, in fact, he has not. Such cross-examination is permissible, as the Supreme Court recognized in *Doyle* by noting a prosecutor may challenge a defendant's contention he told his exculpatory story to police when he actually did not.

358 S.C. at 445, 595 S.E.2d at 491 (citations omitted). However, the court found that McIntosh "did not open the door to any *Doyle* violation" because he "did not, explicitly or implicitly, assert he cooperated with police." *Id.*

*State v. White,* 361 S.C. 407, 605 S.E.2d 540 (2004), involves a defendant convicted of first-degree criminal sexual conduct and kidnapping. At trial, Cole Badger, a psychotherapist who counseled the victim and was qualified as an expert, testified for the State. White argued that Badger was improperly allowed to testify that she believed the victim. The court concluded, "White opened the door to this testimony by cross-examining Badger as to whether she had cases in which she

492

did not believe the alleged victim. *State v. Foster*, 354 S.C. 614, 582 S.E.2d 426 (2003) (one who opens the door to evidence cannot complain of its admission)." *White* at 415–16; 605 S.E.2d at 544.

A number of additional arbitraments are extant wherein South Carolina courts have addressed the door-opening doctrine. *See State v. Foster*, 354 S.C. 614, 582 S.E.2d 426 (2003) (finding Rule 801(d)(1)(B), SCRE is the sole means by which a prior consistent statement may be introduced and therefore, the State's argument that defendant opened the door to the prior consistent statement, while it may have been proper under pre-SCRE law, is simply not tenable under the SCRE); *State v. Bennett*, 328 S.C. 251, 493 S.E.2d 845 (1997) (determining testimony that witness gave defendant drugs proper to rebut prior witness's testimony that implied defendant was adamantly opposed to drugs); *State v. Sullivan*, 277 S.C. 35, 45, 282 S.E.2d 838, 844 (1981) (holding where "[d]efense counsel asked Agent Powell on cross-examination whether the plastic was common place [sic] or specially made[, the] question opened the door for Powell's response that it was used inside the aircraft to set bales of marijuana on."); *State v. Plath*, 281 S.C. 1, 7, 313 S.E.2d 619, 623 (1984) (finding no abuse of discretion where defense offered testimony of an expert who disclosed defendant's juvenile offenses whereupon the State inquired into defendant's adult offenses and escape; the defense, while objecting to the inquiry, admitted that "the 'door' had been 'opened' " to the testimony); *State v. Bell*, 263 S.C. 239, 209 S.E.2d 890 (1974) (ruling that evidence that victim had reported her watch as stolen was proper where defendant averred the victim had given the watch to him); *State v. Spinks*, 260 S.C. 404, 407–08, 196 S.E.2d 313, 315 (1973) ("The appellant in answer to the question of his counsel, 'What charge', introduced into record the testimony regarding the prior crimes for which he was sentenced, and in so doing, 'opened the door' to all crimes for which he was incarcerated, including the crime of carrying a concealed weapon."); *State v. Kennedy*, 143 S.C. 318, 141 S.E. 559 (1928) (finding the trial court properly permitted the State to question victim on the details of previous difficulties victim had with defendant where defendant had first questioned the victim on the details of the prior difficulties); *State v. Bramlett*, 114 S.C. 389, 103 S.E. 755

(1920) (ruling the State may offer rebutting evidence of the defendant's family's reputation for insanity where defendant offers evidence of his family's reputation for insanity); *State v. Marks*, 70 S.C. 448, 50 S.E. 14 (1905) (mentioning the opening the door theory); *State v. Trotter*, 317 S.C. 411, 415, 453 S.E.2d 905, 908 (Ct.App.1995) (citing *Benton & Rhodes, Inc. v. Boden*, 310 S.C. 400, 426 S.E.2d 823 (Ct.App.1993) for the proposition that "there is no error in admitting evidence where the appellant opened the door to the evidence") *aff'd as modified by State v. Trotter*, 322 S.C. 537, 473 S.E.2d 452 (1996).

Adverting to the case *sub judice*, Young's testimony is replete with statements that connote character traits antithetical to the character evinced by his prior convictions of criminal domestic violence and criminal sexual conduct. Most poignant is his statement: "like I told my lawyer, I hate to see a female cry." Yet the denouement of this case need not hang on the lone phrase "I hate to see a female cry"; throughout his testimony, Young characterized himself as a benefactor and protector of women generally and of the victim particularly. His testimony demonstrates a concerted attempt to paint himself as a gallant man with the victim's best interest and safety always on his mind.

Young testified he told the other drug dealers, "I don't want nobody bothering her," and he told the victim to "lock your windows.... Don't talk to nobody." He expanded his expressions of concern for the victim to all women when he asseverated: "I hate to see a female cry." In addition to these physical and emotional concerns, Young related disquietude over the victim's chastity, saying she should not have to "belittle" herself, and telling her he would be "just as wrong if I allowed myself to let you go through this right here [perform sexual favors on him]."

Because Young set before the jury his concern for the victim's safety and chastity, the State was entitled to rebut his assertions with evidence of his prior abuse and the criminal results of his concupiscence. Young opened the door to the convictions for criminal domestic violence and criminal sexual conduct.

## II. Racially Biased Comments

Young claims the trial court erred in allowing the solicitor to ask Young racially inflammatory questions. During cross-examination of Young, the State asked, "Mr. Young, isn't it also true that you like going out and being with white women?" Young admitted that he has a child with a Caucasian woman. The State then asked Young if he "prefer[ed] being with white women."

We find this argument is not preserved for our review. The lack of a contemporaneous objection to an improper argument acts as a wavier, except where a "vicious, inflammatory argument results in clear prejudice." *Toyota of Florence, Inc. v. Lynch,* 314 S.C. 257, 263, 442 S.E.2d 611, 615 (1994). While the *Toyota* court did not condone a failure to make a contemporaneous objection, it found it "wholly unreasonable for any attorney to anticipate" flagrant, abhorrent conduct towards a party or witness. *Id.* However, the issue must be raised to the trial court by way of a post-trial motion. *Dial v. Niggel Assoc., Inc.,* 333 S.C. 253, 257, 509 S.E.2d 269, 271 (1998). Because Young did not make a contemporaneous objection and did not present the issue during a post-trial motion, this issue is not preserved.

## CONCLUSION

Based on the foregoing, Young's convictions are

**AFFIRMED.**

STILWELL, J., concurs.

SHORT, J., dissents in a separate opinion.

SHORT, J., dissenting.

I respectfully dissent regarding the issue of whether the trial court erred in admitting Young's prior convictions for criminal sexual conduct and criminal domestic violence.

In a criminal case, the State cannot attack the defendant's character unless the defendant first places his or her own character in issue. *State v. Taylor,* 333 S.C. 159, 174, 508 S.E.2d 870, 877–878 (1998). "When the accused offers evidence of his good character regarding specific character traits

relevant to the crime charged, the solicitor has the right to cross-examine him as to particular bad acts or conduct." *State v. Major,* 301 S.C. 181, 185, 391 S.E.2d 235, 238 (1990). However, the State is restricted to showing bad character only for the traits initially focused on by the accused. *Id.* Also, "where prior convictions or misconduct are appropriately brought out on cross-examination, the State may inquire only so far as to bring out the nature of the conviction or activity and may not go into details." *State v. Allen,* 266 S.C. 468, 482, 224 S.E.2d 881, 886 (1976), *overruled on other grounds by State v. Evans,* 307 S.C. 477, 415 S.E.2d 816 (1992), and *State v. Torrence,* 305 S.C. 45, 406 S.E.2d 315 (1991).

When the prior crime is similar to the one for which the defendant is being tried, the danger of unfair prejudice to the defendant from impeachment by that prior offense weighs against its admission. *State v. Dunlap,* 353 S.C. 539, 542, 579 S.E.2d 318, 320 (2003). Thus, the trial court must consider the impeachment value of the prior crime, the timing of the prior crime, the similarity between the past crime and the charged crime, the importance of the defendant's testimony, and the centrality of the credibility issue. *Green v. State,* 338 S.C. 428, 433–34, 527 S.E.2d 98, 101 (2000). In determining whether similar prior convictions can be used to impeach the accused, the trial court must weigh the probative value of the prior convictions against their prejudicial effect to the accused and determine, in its discretion, whether to admit the evidence. *Id.*; Rule 609(a)(1), SCRE.

During an *in camera* hearing, the trial judge ruled the probative value of admitting Young's previous conviction for criminal sexual conduct was outweighed by its prejudicial value and allowed the prosecution to proceed by stating only that there was another felony for which Young had been convicted. The prosecution did not raise Young's prior conviction for criminal domestic violence to the judge during the hearing, so the judge did not rule on its admission. After his direct examination, the State argued that Young had placed his character in issue with his statements insinuating that he was concerned about the victim's well-being, particularly in the following testimony:

... and that's when she said, I need to talk to you about something. She said, I ain't ready to go. Not yet. I said,

okay. What's up? So she like start crying. So I said [victim's name], look, I ain't angry no more. Because, see, like I told my lawyer, *I hate to see a female cry.* So I said, all right. I ain't angry no more. I ain't angry no more. It's all good. I ain't angry no more.

(emphasis added). The State further contended that Young placed his character in issue by testifying that he was angry at the victim because "she don't have to belittle herself like that" by performing oral sex on the other drug dealer and by testifying that he told her he was "going to make sure [she was] all right." The trial judge determined that Young's testimony had opened the door by injecting a character trait in issue and allowed the State to impeach the defendant with his prior criminal convictions for a 1994 criminal sexual conduct 3rd degree and a 1993 criminal domestic violence.

After carefully reviewing Young's testimony, I find he did not place his character in issue and, therefore, did not open the door for admitting into evidence his prior convictions for criminal sexual conduct 3rd degree and criminal domestic violence. Young testified he sold drugs to the victim; however, he denied kidnapping or criminally assaulting her. Young's testimony, when considered in proper context, did not connote specific character traits toward his treatment of females, but rather described and explained his version of what transpired between the victim and himself on the night in question.

I now address the question of whether the error was harmless, which necessarily depends on the particular circumstances of any case. "Error is harmless when it could not reasonably have affected the result of the trial." *State v. Reeves,* 301 S.C. 191, 194, 391 S.E.2d 241, 243 (1990). "Error which substantially damages the defendant's credibility cannot be held harmless where such credibility is essential to his defense." *Id.* Young was on trial for criminal sexual conduct 1st degree and kidnapping. The trial jury could have concluded that Young had a greater propensity to commit a crime of a sexual nature because of his prior convictions for criminal sexual conduct 3rd degree and criminal domestic violence. *Id.* Whether Young committed the offenses of criminal sexual conduct 1st degree and kidnapping in this case essentially boils down to the conflicting testimony of the victim and

Young himself. Because of the credibility issue in this case, the erroneous admission of Young's prior convictions for similar offenses cannot be found to be harmless error, and, therefore, I would reverse and remand Young's conviction for criminal sexual conduct 1st degree and kidnapping.