**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

ISRAEL ERNESTO PALACIOS, a/k/a
Homie,

        *Defendant-Appellant.*

⎫
⎬
⎭

No. 08-5174

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, Chief District Judge.
(8:05-cr-00393-DKC-14)

Argued: March 22, 2012

Decided: April 30, 2012

Before DUNCAN, AGEE, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Agee and Judge Diaz joined.

---

## COUNSEL

**ARGUED:** Peter Linn Goldman, Alexandria, Virginia, for Appellant. Robert K. Hur, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

**ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

Appellant Israel Ernesto Palacios (a.k.a. "Homie") was convicted by a jury of a number of crimes arising from his involvement in the street gang La Mara Salvatrucha, otherwise known as MS-13. Specifically, the jury found him guilty of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d); conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); use of a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and murder resulting from the use of a firearm in a crime of violence, in violation of 18 U.S.C. § 924(j). He raises various challenges to these convictions on appeal, focusing on the district court's admission of certain testimony and the sufficiency of the evidence to support his convictions under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, and the Violent Crimes in Aid of Racketeering Act ("VICAR"), 18 U.S.C. § 1959. Finding Palacios's arguments unpersuasive, we affirm.

### I.

We begin our discussion with an overview of the history, organization, and structure of MS-13, to which Palacios belonged. We then set forth the facts underlying Palacios's convictions, followed by a description of his indictment and trial.

A.

MS-13 is a transnational gang formed by El Salvadorian immigrants in Los Angeles, California in the 1980s.[1] Originally organized to protect its members from being preyed upon by other gangs in southern California, MS-13 grew into a larger organization characterized by intimidation and violence. Enhancing its reputation for violence became the gang's primary purpose. MS-13 eventually expanded into Central America, Mexico, Canada, and other areas of the United States. In addition to Los Angeles, MS-13 strongholds in this country include metropolitan Washington, D.C.—including northern Virginia and southern Maryland—Long Island, New York; Houston, Texas; Boston, Massachusetts; and North Carolina. This case involves MS-13 activities in and around Prince George's County, Maryland.

Although MS-13 members are affiliated with their counterparts throughout North America, the gang is organized into smaller subgroups or "cliques" that operate locally. Each clique has its own leadership, conducts its own meetings, and is permitted to create rules in addition to—but not in place of—the rules of the broader gang. Cliques are run by a leader, known as the "first word"; a gang member who assumes the role of second in command, known as the "second word"; and a treasurer or secretary. Clique leaders gather periodically at regional meetings led by mid-level bosses, known as "ranfleros." At these meetings, clique leaders share information about law enforcement activities in their areas, settle arguments, and discipline members who have violated gang rules. Ranfleros also relay directives from top MS-13 leaders who reside outside the United States.

---

[1]We have previously discussed the origins and practices of MS-13 in an opinion concerning the same larger MS-13 conspiracy in which Palacios was involved. *See United States v. Ayala*, 601 F.3d 256, 261 (4th Cir. 2010).

The gang utilizes uniform rules, regulations, and symbols[2] throughout the many territories in which it is located. For example, the method of initiation into the gang is the same throughout its various iterations: a prospective MS-13 member is beaten for 13 seconds "to signify the beginning of a new, more brutal lifestyle." *United States v. Ayala*, 601 F.3d 256, 261 (4th Cir. 2010). Gang members are required to fight—and, if possible, kill—members of rival gangs. Those who have been initiated into MS-13 may not assist law enforcement, and they are prohibited from using numbers or colors associated with rival gangs. MS-13 members are required to attend local clique meetings and pay dues. These dues are used for, among other things, sending money to gang members in other countries, financing attorneys for gang members who have been arrested, and buying weapons or other equipment for the use of the gang. Cliques maintain discipline by imposing punishments—ranging from a short beating (a "13") to death (a "green light")—in response to violations of gang rules. MS-13 cliques also have an internet presence and have been known to post information on websites such as MySpace.

B.

The primary MS-13 clique involved in this prosecution is known as the Langley Park Salvatruchas ("LPS"). Palacios co-founded LPS and operated as its second word and, subsequently, as its first word. Trial testimony indicated that, as relevant to this appeal, Palacios helped orchestrate the murder of Nancy Diaz during the time he was second word of LPS.

Palacios and Roberto Argueta (a.k.a. "Buda")—who was LPS first word at the time—heard rumors that Diaz, a female friend of LPS members, had been fraternizing with rival gang members. The two investigated whether the rumors were true,

---

[2]MS-13's uniform symbols include the letters "M" and "S"; the numbers "13," "X3," and "3C"; the colors blue and white; and devil horns.

questioning Suyapa Chicas,[3] Palacios's girlfriend at the time, about whether Diaz had been spending time with members of rival gangs. Chicas confirmed that she had heard the same rumors. Sometime thereafter, Argueta and Palacios brought up the issue of Diaz's supposed interactions with rival gangs at an LPS clique meeting. As the conversation proceeded, Palacios and the other LPS leaders determined that Diaz needed to be killed and began planning her death. At the conclusion of the meeting, Argueta issued a final order that Diaz should be killed. Palacios was involved in the discussion throughout and stood by Argueta's side as he issued the order.

LPS members Jesus Canales (a.k.a. "Fantasma") and Jeffrey Villatoro (a.k.a. "Magic") carried out the order to kill Diaz. On October 25, 2004, Canales and Villatoro drove Diaz and her friend Alyssa Tran to a cemetery near Langley Park, Maryland, informing the two women that they were going to drink together. Instead, once inside the cemetery grounds, Canales and Villatoro fell behind the two women. Tran heard a gunshot from behind and felt Villatoro pull her to the ground. Villatoro then shot Tran in the face. When Canales discovered Tran had not perished from the gunshot wound, Canales stabbed her twice in the chest. Tran somehow survived the attack and began searching for Diaz. When Tran found Diaz, the latter was dead.

## C.

In August 2005, a federal grand jury sitting in the District of Maryland indicted Palacios and 18 others on various charges arising from their participation in MS-13. On June 4, 2007, the grand jury returned a fourth superseding indictment charging Palacios with conspiracy to participate in racketeering activity, conspiracy to commit murder in aid of racketeering, murder in aid of racketeering, assault with a dangerous

---

[3]Chicas's first name is alternatively spelled "Suyaba" in certain trial documents and in Palacios's brief.

weapon in aid of racketeering, two counts of use of a firearm in relation to a crime of violence, and murder resulting from the use and carrying of a firearm in relation to a crime of violence.

### 1.

Prior to trial, the parties entered into a discovery agreement. The agreement provided, in relevant part:

> The government agrees that it will provide reasonable notice of the existence of alleged other crimes, wrongs or acts committed by [Palacios] pursuant to Rule 404(b) of the Federal Rules of Evidence, along with copies of all physical and documentary evidence believed by the government to fall within the ambit of Rule 404(b) which the government intends to introduce at trial in its case-in-chief. The government acknowledges its continuing duty to disclose Rule 404(b) evidence as it is recognized as such after the time period in which the government has provided Rule 16 material.

J.A. 97.

The government made several pretrial disclosures regarding evidence and testimony it intended to introduce. On May 12, 2008, nine weeks before trial, the government sent a letter to Palacios's attorney indicating that it planned to introduce evidence of an attempted robbery in which Palacios was involved in 2001, an alleged attack on rival gang members for which Palacios was arrested in 2002, and a shooting in which Palacios was involved in 2004. On June 4, 2008, six weeks before trial, the government sent another letter disclosing its intention to introduce evidence regarding, inter alia, two robberies in which Palacios participated in 2001 and a 2004 incident during which Palacios fired gunshots at rival gang

members. All of these incidents were related to Palacios's participation in MS-13.

   In response to these letters, Palacios moved to exclude these matters from trial or, in the alternative, to require the government to amend the indictment to include them as charged overt acts in furtherance of a conspiracy. During a June 9, 2008, hearing on the motion, the district court noted:

> [T]hey don't have to charge in an indictment every act they allege a defendant participated in . . . . I told [the government] they needed to [give notice] well in advance, and they did it at least a month to two months in advance and gave [the relevant information] to [Palacios].

J.A. 238-39. It further stated that this information was "not 404(b) evidence," but rather evidence of "events that the Government was using as part and parcel of the conspiracy." J.A. 253. The district court noted that "[the government] is not required in a conspiracy case to give advance notice of any discrete acts it contends [were] part of the conspiracy." J.A. 259. It concluded by stating that "[t]he Government has done in this case what I directed them to do in terms of advance preparation . . . , and I am not going to prevent them from using this evidence on the ground of the timing of the disclosure." J.A. 260. It therefore denied Palacios's motion.

2.

   Palacios's trial began on July 15, 2008 and lasted until August 8, 2008. As pertinent to this appeal, the government called as witnesses Sergeant George Norris of the Prince George's County Police Department; former MS-13 member Wilbur Garcia-Martinez; Palacios's former girlfriend Suyapa Chicas; and Alirio Osorio, a former LPS member who later became a government informant.

Sergeant Norris testified both as an expert witness and a fact witness. Based on his training and experience investigating MS-13 as part of the Prince George's County Police Department Gang Unit, Norris provided expert testimony on the gang's development, organization, policies, practices, and symbols. He also provided lay testimony about events he personally observed while investigating Maryland-area MS-13 cliques. The district court permitted Norris to testify in both capacities, but it required the government to indicate when it was transitioning from Norris's expert opinion to his personal observations.

Garcia-Martinez testified primarily about statements Palacios made to him when the two were incarcerated together. In 2006, Garcia-Martinez pleaded guilty to participating in the same broader Maryland-area MS-13 conspiracy that Palacios was charged with participating in. Around January 2008, Garcia-Martinez and Palacios were placed in the same prison cell for a period of approximately two months at a SuperMax facility in Baltimore, Maryland. Garcia-Martinez testified that, at some point during that time, Palacios told Garcia-Martinez that, if Palacios were found guilty but later released from prison, "he would come back and return to kill all the snitches." J.A. 1678.

Chicas testified extensively about her knowledge of Palacios's involvement in MS-13. She provided information about a number of criminal acts Palacios committed during his time as a member of the gang—some of which were charged in the indictment and others of which were not. She specifically provided information about the operation of the LPS clique, as well as about the murder of Nancy Diaz.

Osorio also testified about Palacios's involvement in Diaz's murder, as well as about his observations regarding the structure and organization of the LPS clique. The substance of this testimony tracked the facts discussed in section B.

At the close of the government's evidence, Palacios filed a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motion.

3.

On August 8, 2008, the jury found Palacios guilty of conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering, murder in aid of racketeering, use of a firearm in relation to a crime of violence, and murder resulting from the use of a firearm in relation to a crime of violence.[4] Palacios filed a renewed motion for judgment of acquittal and a motion for a new trial on August 20, 2008, both of which the district court denied.

On November 12, 2008, the district court sentenced Palacios to life imprisonment, followed by a consecutive sentence of 240 months' imprisonment. This appeal followed.

II.

Palacios raises five arguments on appeal, which fall into two broader categories: challenges to the district court's admission of certain witness testimony and challenges to the sufficiency of the evidence to support his convictions. We discuss Palacios's specific claims falling within each category in turn.

A.

With respect to the admission of evidence, Palacios first argues that the district court abused its discretion by permit-

---

[4]The jury acquitted Palacios of assault with a dangerous weapon in aid of racketeering and an additional count of using a firearm in relation to a crime of violence. Both of these charges were predicated upon the attack of Alyssa Tran, which, as discussed above, occurred in conjunction with Nancy Diaz's murder.

ting Sergeant George Norris to testify as an expert, contending that through his testimony, Norris acted as a conduit for testimonial hearsay, thereby violating Palacios's rights under the Confrontation Clause. Second, Palacios asserts that the district court abused its discretion by admitting evidence of his prior bad acts, claiming that the government failed to give adequate notice of its intent to introduce such evidence. Third, Palacios argues that the district court abused its discretion by admitting the testimony of Palacios's cellmate Garcia-Martinez, contending that Garcia-Martinez "acted as an agent of the government" when he discussed MS-13 with Palacios. Appellant's Br. 72.

"We review for abuse of discretion a trial court's decision concerning the admissibility of evidence." *United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011). We will not find that a district court abused its discretion "unless its ruling was arbitrary and irrational." *Id.* (quotation marks omitted). "We review de novo, however, an evidentiary ruling implicating the Confrontation Clause." *Id.*

1.

We first consider Palacios's contention that the district court abused its discretion by admitting the expert testimony of Sergeant Norris. Palacios argues that Norris's testimony contained inadmissible hearsay and that Norris's use of such hearsay violated Palacios's rights under the Confrontation Clause of the Sixth Amendment, as interpreted by *Crawford v. Washington*, 541 U.S. 36 (2004). We disagree.

Federal Rule of Evidence 703 allows an expert witness to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." This includes inadmissible evidence—including hearsay—"[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; *see also United States v. Leeson*, 453 F.3d

631, 637 (4th Cir. 2006) (holding that a district court did not abuse its discretion by admitting expert testimony based on hearsay when it had been "sufficiently established" that such hearsay statements were the type of information "reasonably relied upon by experts in [the] field").

Under *Crawford*, testimonial hearsay raises special concerns, however, because it implicates a defendant's constitutional rights. *See United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). *Crawford* established that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54. The Supreme Court has not provided a definitive definition of "testimonial," but a statement "procured with a primary purpose of creating an out-of-court substitute for trial testimony" is the quintessential example of testimonial hearsay. *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011). Although "*Crawford* forbids the introduction of testimonial hearsay as evidence in itself," we have recognized that "it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence." *Johnson*, 587 F.3d at 635. The touchstone for determining whether an expert is "giving an independent judgment or merely acting as a transmitter for testimonial hearsay" is whether an expert "is applying his training and expertise to the sources before him," thereby producing "an original product that can be tested through cross-examination." *Id.*

Applying this test, we rejected a claim identical to the one before us in *United States v. Ayala*, 601 F.3d 256 (4th Cir. 2010). *Ayala* involved the same MS-13 conspiracy we confront here, and similar to Palacios, the appellants in that case claimed that the district court's admission of the expert testimony of Sergeant Norris and two other law enforcement officials violated their Confrontation Clause rights because the

testimony "relied in part on interviews with unnamed declarants." *Id.* at 274. We held that no *Crawford* violation had occurred, observing:

> As an initial matter, it is unclear whether the interviews these experts relied on were even testimonial, given that the record is rather bare about the circumstances in which they were conducted. But even if we assume that each expert did rely on testimonial statements, that fact alone does not offend the Confrontation Clause because the experts did not act as mere transmitters and in fact did not repeat statements of particular declarants to the jury. Instead, they offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular. These judgments resulted from many years of observing the gang, studying its methods, and speaking with its members. Given that each expert was subject to cross-examination about his judgment, we find no error in the admission of their testimony.

*Id.* at 275.

Here, Sergeant Norris explained the bases for his expertise regarding MS-13. These included extensive gang culture training, interactions with other law enforcement officers who specialize in gangs, personal observation through surveillance and executing search warrants, and "[h]undreds and hundreds . . . , if not thousands" of interviews with MS-13 members and victims of MS-13 gang violence. J.A. 637. As in *Alaya*, the record before us is unclear as to whether these interviews were testimonial. *See* 601 F.3d at 275. Palacios, in fact, makes no assertion that they were. Assuming at least some of the interviews Norris conducted produced testimonial hearsay, however, Norris did not specifically reference any of these interviews during his expert testimony, nor did he make any

mention of Palacios in particular. Rather, he used these interviews, along with the other sources of his extensive knowledge about MS-13, to form an independent opinion about the gang's history, operation, structure, practices, and symbols. Norris was available for cross-examination regarding this opinion. As such, we reiterate our position in *Alaya* that the admission of Norris's testimony was not a *Crawford* violation, even if his expert opinion was based, in part, on testimonial hearsay.

The Second Circuit's decision in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), upon which Palacios relies, does not alter the analysis. In that case, the Second Circuit held that a police officer's expert testimony violated Rule 703 and the appellants' Sixth Amendment rights by repeating on the stand "out-of-court testimonial statements made by individuals during custodial interrogations." *Id.* at 199. We distinguished this case in *Johnson* by noting that it turned upon the fact that "the expert simply passed along an important testimonial fact he learned from a particular interview," which did not require him to apply any independent expertise. 587 F.3d at 636. The expert testimony in *Mejia* was thus unlike the expert testimony in *Johnson*—and in this case—in which the expert witness "appl[ied] [his] expertise, derived over many years and from multiple sources" to provide an independently formed opinion. *See Johnson*, 587 F.3d at 636. We therefore find Palacios's claim to be without merit.[5]

---

[5]As discussed above, Norris also testified as a fact witness in this case. In this role, he was permitted to describe his personal observations of specific MS-13 activities. Palacios contended at oral argument that the district court abused its discretion by failing to properly delineate between Norris's role as an expert and his role as a fact witness. Palacios did not raise this contention in his opening brief and, as such, has waived it. *See, e.g.*, *Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001). Even if Palacios had not waived this argument, however, we do not agree with his contention. The government clearly stated when it was transitioning from Norris's testimony as an expert witness to his testimony as a fact witness. Moreover, the district court sustained several objections Palacios raised at trial, in

## 2.

Palacios next contends that the district court abused its discretion by "allowing the government to introduce evidence of alleged prior bad acts by Mr. Palacios without notice to the defense." Appellant's Br. 44. This argument fails. As we explain, the evidence introduced by the government that Palacios refers to as "prior bad acts" does not implicate "other crimes, wrongs, or acts" governed by Federal Rule of Evidence Rule 404(b). Given that the testimony to which Palacios points was not governed by Rule 404(b), the government was under no obligation to disclose any of this information—and none of the authorities to which Palacios points suggest otherwise.

### a.

Palacios claims that the district court improperly allowed the government to introduce evidence of his "prior bad acts"—a phrase that typically refers to evidence governed by Rule 404(b). *See, e.g.*, *United States v. Chin*, 83 F.3d 83, 87-88 (4th Cir. 1996).

> The Rule 404(b) inquiry, however, applies only to evidence of other acts that are extrinsic to the one charged. Acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence. Evidence of uncharged conduct is not other crimes evidence subject to Rule 404 if the uncharged conduct arose out of the same series of

---

which he contended Norris was confusing the two roles. Finally, Norris's lay testimony was quite limited and mentioned Palacios only once. Based on this record, which demonstrates that the district court "implement[ed] adequate safeguards to prevent juror confusion," we cannot say that the district court abused its discretion by allowing Norris to testify as both an expert and fact witness. *See United States v. Baptiste*, 596 F.3d 214, 223-24 (4th Cir. 2010).

> transactions as the charged offense, or if evidence of the uncharged conduct is necessary to complete the story of the crime on trial.

*United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (quotation marks, alterations, and citations omitted). "It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004). Evidence that does not fall within the purview of Rule 404(b) is admissible if it is relevant—meaning having "any tendency to make" the existence of any fact that "is of consequence" to the determination of the action "more or less probable than it would be without the evidence," Fed. R. Evid. 401—and it is not otherwise required to be excluded by the Constitution, statute, or federal rule, Fed. R. Evid. 402.

Here, Palacios claims that certain testimony of three government witnesses improperly referenced his prior bad acts without prior disclosure. Specifically, Palacios contends that the district court erred by allowing Suyapa Chicas to testify about: a robbery she saw Palacios commit with another MS-13 member, Palacios's firing of a gun in the direction of members of a rival gang, and two conversations Palacios had with her about Nancy Diaz. Palacios also contends that the district court improperly allowed Alirio Osorio to testify about meetings in which Palacios and other MS-13 members discussed the murders of Diaz and others. Finally, Palacios claims that the district court improperly permitted Wilbur Garcia-Martinez to testify about Palacios's possession of a gun and about Palacios's claim that he would "kill all the snitches."[6] J.A. 1744.

---

[6]Our review of the record indicates that Palacios objected to some, but not all, of this testimony at trial. He also moved to exclude some, but not all, of these statements in the pretrial motion discussed above. Because we conclude that Palacios's arguments fail even assuming he preserved an objection to every statement, we do not distinguish between the statements to which Palacios objected and those he did not.

All of this testimony, however, is express proof of the conduct for which Palacios was indicted—or otherwise "necessary to complete the story of the crime on trial"—not evidence of other bad acts. *See Basham*, 561 F.3d at 326 (quotation marks omitted). Any discussion of Diaz is directly related to the murder in aid of racketeering and conspiracy to commit murder in aid of racketeering charges included in the indictment. And the remaining testimony to which Palacios draws our attention, such as the description of the robbery, relates to Palacios's participation in MS-13 and can be properly characterized as "acts committed in furtherance of the conspiracy." *See Janati*, 374 F.3d at 270. For these reasons, we agree with the district court's conclusion that Palacios's characterization of this evidence as "prior bad acts" is incorrect, and we find that the government was under no Rule 404(b) disclosure obligations.

b.

Palacios points to three additional sources that he claims required the government to disclose the above-cited evidence prior to trial: Federal Rule of Criminal Procedure 16, the pretrial discovery agreement between the parties, and certain statements of the district court. We agree with the district court that none of these sources required disclosure.

"Generally, criminal defendants do not have a constitutional right to discovery, absent a statute, rule of criminal procedure, or some other entitlement." *United States v. Uzenski*, 434 F.3d 690, 709 (4th Cir. 2006). Rule 16 imposes upon parties an ongoing duty to disclose "additional evidence or material" discovered "before or during trial . . . if . . . the other party previously requested, or the court ordered, its production." Fed. R. Crim. P. 16(c). Rule 16 also provides, however, "[n]or does this rule authorize the discovery or inspection of statements made by prospective government witnesses." *Id.* at 16(a)(2).

Palacios's contention that Rule 16 required the government to disclose the evidence to which he points before trial is incorrect. Rule 16(a)(2) expressly states that the government is *not* required to disclose the statements of government witnesses. *See also United States v. Cole*, 857 F.2d 971, 975 (4th Cir. 1988) ("We . . . decline to carve an exception from [Rule 16(a)(2)'s] prohibition for statements of government witnesses that happen to contain statements made by a defendant."). Palacios's citation to Rule 16(c) is also of no avail, as he did not request, nor did the district court order, the government to disclose any such evidence prior to trial.

We also find Palacios's contention that either the pretrial agreement or the district court's statements required disclosure to be without merit. As discussed, the pretrial agreement merely stated that the government would "provide reasonable notice of the existence of alleged other crimes, wrongs, or acts committed by [Palacios] pursuant to Rule 404(b) . . . which the government intends to introduce at trial"—and this evidence was not governed by 404(b). J.A. 97. Finally, our review of the hearing to which Palacios draws our attention, detailed above, provides no indication that the district court issued any instruction to the government regarding disclosure that the government subsequently failed to follow. In short, Palacios provides no authority to support his claim that the government should have given him pretrial notice about the substance of this testimony.[7]

### 3.

Palacios's final contention regarding the admission of testimony is that the district court abused its discretion by permitting his former cellmate Wilbur Garcia-Martinez to testify,

---

[7]We note that we find Palacios's argument particularly unsympathetic because the government *did* disclose, more than a month prior to trial, its intention to put forth much of the evidence to which Palacios objects—despite having no binding obligation to do so.

without prior disclosure, that Palacios had promised to "kill all the snitches." J.A. 1678. Palacios claims the prosecution's failure to disclose this testimony violated Federal Rule of Criminal Procedure 16 because Garcia-Martinez was acting as a government agent when he spoke with Palacios. He bases this contention on the fact that Garcia-Martinez had entered into a plea agreement with the government prior to his interactions with Palacios, claiming that Garcia-Martinez spoke to Palacios with the intention of "seeking to curry favor with the Government regarding a Rule 35(b) Motion for reduction of sentence" and that Garcia-Martinez's plea agreement constituted "a binding contract on Mr. Garcia to assist the government." Appellant's Br. 71. We find these arguments unpersuasive.

Rule 16 provides that "[u]pon a defendant's request, the government must disclose . . . the substance of any relevant oral statement made by the defendant . . . in response to interrogation by a person the defendant knew was a government agent." Fed. R. Crim. P. 16(a)(1)(A). We have emphasized that the rule "only requires the disclosure of witness statements made in response to interrogation by a person acting as a government agent." *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002) (quotation marks omitted). To determine whether an informant was acting as a government agent at the time he spoke with a defendant, "[t]he court must look at all of the circumstances to determine whether the informant's actions are 'fairly attributable to the government.'" *United States v. Lentz*, 524 F.3d 501, 520 (4th Cir. 2008) (quoting *Thomas v. Cox*, 708 F.2d 132, 136 (4th Cir. 1983)). For example, the Supreme Court has held that an inmate jailed in the same cell block as a defendant who "was acting under instructions as a paid informant for the Government"—instructions to "be alert to any statements made by [the defendant]" but "not to question [the defendant] about the charges"—on a contingent-fee basis was a government agent for Sixth Amendment purposes.[8] *United States v. Henry*, 447 U.S. 264,

---

[8] The majority of the cases cited in this section involve a defendant who has alleged a violation of his Sixth Amendment right to counsel, rather

268, 270 (1980). The Court recognized, however, that a "jail-house informant" was not necessarily a government agent if he was merely "instructed to overhear conversations and to engage a criminal defendant in some conversations." *Id.* at 276. We have never held that a jailhouse informant was acting as a government agent in the absence of specific instructions from the government or promises from the government prior to the informant's conversations with an accused person. *See Harker v. Maryland*, 800 F.2d 437, 444-45 (4th Cir. 1986) (jailhouse informant was not a government agent when he was "not paid, nor was he acting under the instructions or solicitations of the government," but only "responded to a general request for information, and no promises were made to him"); *Carter*, 300 F.3d at 423 (defendant's cellmate was not acting as a government agent when he "later agreed to be a government witness").

Based on this case law, Garcia-Martinez was not acting as a government agent here. The district court found that the government did not play any role in having Garcia-Martinez placed in the same cell as Palacios. It also found that he did not receive specific instructions about what to do or not do if he came into contact with MS-13 members while incarcerated. As the district court put it, "[t]here has been no evidence that [Garcia] was placed [in the same cell as Palacios] for the purpose even of overhearing things, never mind eliciting them or, in fact, that he thought that it was his job to try to get information on the part of the government." J.A. 1704. There was also no evidence that the government promised Garcia-Martinez any reduction in sentence prior to his conversations with Palacios.

than erroneous admission of testimony without prior disclosure in violation of Rule 16. Palacios has not alleged that Garcia-Martinez's testimony violated his Sixth Amendment rights, but we find the analysis equally appropriate in this context.

Palacios does not contest these factual findings upon appeal, nor does he claim that the government directly provided instructions to Garcia-Martinez prior to his speaking with Palacios. Given that the government had no part in Garcia-Martinez's interactions with Palacios, the district court was correct to reject Palacios's argument that Garcia-Martinez's plea agreement—which did include a clause about Garcia-Martinez's ongoing obligation to cooperate with the government—alone made him a government agent. Thus, the district court did not abuse its discretion by admitting Garcia-Martinez's testimony without prior disclosure.

### B.

We now consider Palacios's arguments concerning the sufficiency of the evidence to support his convictions. He first claims that the evidence introduced at trial was insufficient to prove that MS-13 was an enterprise, as required to secure a conviction under the RICO statute. Palacios also argues that there was insufficient evidence to convict him of murder in aid of racketeering under the VICAR statute, principally because the testimony supporting the murder element of this count was "limited" and "fundamentally flawed." Appellant's Br. 64. We address these contentions in turn.

"We review the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to support the conviction." *United States v. Jaensch*, 665 F.3d 83, 93 (4th Cir. 2011) (quotation marks omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). "[D]eterminations of credibility are within the sole province of the jury and are not susceptible to judicial review." *Id.* at 863 (quotation marks omitted).

1.

Palacios's primary contention as to why the evidence presented at trial was insufficient to allow a jury to find that MS-13 was an "enterprise" under 18 U.S.C. § 1962 is that "the record describes an essentially local organization, mainly of autonomous cliques, which function independently" and whose primary "activity is local street crime, often spur of the moment, impulsive acts." Appellant's Br. 61. We disagree. The evidence presented is easily sufficient to allow a jury to determine that MS-13 was a RICO enterprise.[9]

RICO makes it "unlawful for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). It also criminalizes conspiracy to engage in such activity. *Id.* at § 1962(d). Section 1961(4) defines an "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

In *United States v. Turkette*, 452 U.S. 576 (1981), the Supreme Court clarified that the term "enterprise" encompasses "both legitimate and illegitimate enterprises within its scope." *Id.* at 580. It held that an enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct," which is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

---

[9]Although we have previously rejected challenges to the sufficiency of the evidence to support the convictions for RICO conspiracy of MS-13 members involved in the same series of Maryland-area prosecutions we confront here, *see Ayala*, 601 F.3d at 274 n.2; *United States v. Zelaya*, 336 F. App'x 355, 358-59 (4th Cir. 2009) (unpublished), we have never spelled out our reasoning in a published opinion. We do so here.

at 583. The Supreme Court more recently explained in *Boyle v. United States*, 556 U.S. 938 (2009), that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 945. It cautioned, however, against reading the term "enterprise" too narrowly:

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods . . . . Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 948.

Based on this guidance from the Supreme Court, the government here easily presented sufficient evidence to allow a reasonable jury to determine that MS-13 was an enterprise. Specifically, the testimony of Sergeant Norris provided the jury with adequate support for its finding that MS-13 members had a "common purpose of engaging in a course of con-

duct," that the organization was "ongoing," and that "the various associates function[ed] as a continuing unit." *See Turkette*, 452 U.S. at 583. Norris explained that MS-13 was originally formed by El Salvadorian immigrants in the Los Angeles area for protection from other gangs and that establishing and maintaining its reputation for violence continues to be the central purpose of MS-13. He informed the jury that MS-13 members further this purpose by committing violent crimes and through other activities like painting graffiti. He testified that MS-13 has rules and regulations that govern the gang on a transnational basis, as well as common symbols, gestures, colors, and parlance, but that the gang is broken down into individual cliques at a local level, each of which has its own leadership, meetings, and rules. Norris explained the formal, ritualized process involved in becoming a member of MS-13. He also told the jury that MS-13 members pay dues to help pay for, among other things, attorneys for gang members who have been arrested, and that members of different cliques use the internet to communicate with each other. Norris concluded his expert testimony by opining that MS-13 likely has at least 100,000 members throughout the United States, El Salvador, Guatemala, Honduras, Mexico, and Canada. Norris's testimony about the operation and organization of local MS-13 cliques—and in particular, the meetings they held and the manner in which they enforced gang rules—was corroborated by the testimony of Alirio Osorio and Suyapa Chicas. This evidence was more than sufficient to support the jury's verdict. As such, we reject Palacios's challenge.

2.

Finally, Palacios argues that the government did not present sufficient evidence to allow a jury to convict him of murder in aid of racketeering. His only contention in support of this claim is that the witnesses whose testimony provided the necessary evidence connecting him to Nancy Diaz's murder—Suyapa Chicas and Alirio Osorio—were not credible for various reasons. This argument has no merit.

"[T]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented. And, in conducting such a review, we are obliged to view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the prosecution." *United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006) (quotation marks and citations omitted). As such, we easily reject Palacios's final claim.

## III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*