773 S.E.2d 914

**The STATE, Respondent,**

v.

**Ron Santa McCRAY, Appellant.**

**Appellate Case No. 2012–213393.**
**No. 5321.**

Court of Appeals of South Carolina.

Heard Jan. 6, 2015.
Decided June 24, 2015.

78

James Kristian Falk, of Bush Law Group, P.C., of Charleston, and Chief Appellate Defender, Robert Michael Dudek, of Columbia, for appellant.

Attorney General, Alan McCrory Wilson, Chief Deputy Attorney General, John W. McIntosh, Senior Assistant Deputy Attorney General, Donald J. Zelenka, Assistant Attorney General, Kaycie Smith Timmons, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for respondent.

WILLIAMS, J.

Ron McCray appeals his murder conviction, arguing the circuit court erred in (1) denying his request to charge the jury with the language from section 16–11–440(C) of the South Carolina Code (Supp.2014); (2) allowing an expert who did not prepare a forensic report to testify and act as a conduit for the admission of the report; (3) refusing to admit testimony relating to Reginald Porcher's criminal record, drug use, and previous violent acts; and (4) restricting his cross-examination of two witnesses when the State failed to produce relevant impeachment evidence prior to his initial cross-examination of the two witnesses. We affirm.

## FACTS/PROCEDURAL HISTORY

On September 16, 2009, an officer with the City of Charleston Police Department was called to the scene of a shooting on Jack Primus Road in Berkeley County, South Carolina. Upon arriving at the scene, the officer saw a female on her knees with Reginald Porcher's head cradled next to her body. He noticed blood around Porcher, who did not appear to be conscious. The officer cleared the group of people who had gathered around the woman and secured the scene. Police arrested McCray the following day and charged him with the murder of Porcher. His case was called for trial on October 29, 2012.

At trial, the State called Joyce Wright to testify. Joyce testified she was sitting on her friend's porch when Porcher was shot. She stated she saw a tall person wearing a white t-shirt walking toward a crowd near a tree [1] with something in his hand. Joyce testified she then heard a gunshot and the children who were playing nearby began to run away from the tree. According to Joyce, she also heard the children yelling "Ron shot Reggie" as they fled the area. Joyce stated she observed Porcher walking around in a circle and holding his neck before he fell to the ground.

Felicia Coaxum, who lived with Joyce, also testified at trial. Coaxum testified that, at the time of the shooting, she was

---

1. Underlie Road, which runs off Jack Primus Road, has a tree that is a gathering place for families who live in the area. The area where the tree is located belongs to the heirs of Mr. Wigfall. McCray is a direct descendent of Mr. Wigfall through his mother, who is still alive.

asleep in her mother's room and was awakened by a loud noise. She looked outside and saw Porcher's truck rolling backwards toward the woods. Coaxum testified that—as the truck was rolling—back she saw Porcher lying on the ground, and McCray was standing over him holding something that had a "metal, wooden handle." According to Coaxum, McCray stomped on Porcher while saying "die mother-f* * *er, die." While Porcher was lying on the ground, Coaxum stated McCray asked the other people in the area if they had a problem and said "that he's God." Coaxum testified that, after stomping on Porcher, McCray got into a car and left.

In addition to Joyce and Coaxum, the State offered the testimony of Akeem Ashby. Ashby testified he was at the tree when McCray pulled up in his car and got out with a shotgun in his hand. As Ashby began to run away from the area, he said he heard a gunshot. Ashby also testified he heard McCray say "[s]omething like . . . I assure you all I'm God."

At the conclusion of Ashby's testimony, the State recalled Joyce and questioned her about a 2001 fraudulent check charge. Joyce confirmed she had a fraudulent check charge on her record, and the State did not ask any additional questions. On cross-examination, McCray asked Joyce if she knew Abdullah Fishburne, but the circuit court instructed McCray that this cross-examination was limited to Joyce's prior convictions. McCray withdrew the question, and Joyce was dismissed. Next, the State recalled Coaxum and questioned her about a 2004 breach of trust charge. McCray had no additional questions for Coaxum on cross-examination.

Porcher's father (Father), Robert Porcher Jr., also testified during the trial. During his testimony, the State asked Father if Porcher would have had a professional football career like Porcher's older brother, and Father responded that an automobile accident prevented Porcher from playing football. McCray argued that Father's testimony opened the door for testimony regarding prior bad acts because the jury could construe the testimony about a potential football career as evidence of Porcher's good character. As it pertained to the automobile accident, the circuit court limited McCray's cross-examination to the effect the accident had on Porcher's

physical abilities. However, after McCray cross-examined Father, the circuit court allowed McCray to proffer testimony from Father regarding Porcher's prior criminal convictions. McCray then questioned Father about Porcher's previous convictions for burglary, disturbing schools, and fighting.

After McCray's cross-examination of Father—but before proffering his additional testimony—McCray argued he should be allowed a second unlimited opportunity to cross-examine Joyce and Coaxum because he did not receive their criminal records in discovery. According to McCray, knowledge of their previous convictions would have altered the way he prepared for and questioned the witnesses. The State acknowledged its failure to immediately turn over the reports was a mistake, but noted it did not realize this mistake until the witnesses were on the stand. The circuit court denied McCray's request for a second unlimited cross-examination of Coaxum and Joyce.

Next, the State called James Boykin to testify. Boykin testified that—after McCray shot Porcher—McCray called him and told him, "I shot that mother-f* * *er" and "I hope he died." McCray also told Boykin he spit in Porcher's face and said "die mother-f* * *er, die." According to Boykin, McCray arrived at his house the morning after the shooting and told him "he needed to go get his check and stuff because he had to handle some business because he kn[ew] he was in trouble." Boykin testified McCray called his supervisor to have his check put in Boykin's name. Boykin drove to the construction site where McCray had previously worked to pick up McCray's check and work tools. Boykin stated that, while he was at the site, he spoke with a former employer and the owner of the site, after which he decided to call 911 out of fear of being charged as an accomplice to murder. Next, Boykin testified he took McCray's check to the bank, cashed the check, and gave the money to McCray. Boykin said he then took McCray to a pawn shop where he planned to sell his work tools, but because Boykin had called 911, the police were waiting at the pawn shop where they arrested Boykin and McCray in the parking lot.

The State subsequently called Stephanie Stanley, a forensic analyst with the State Law Enforcement Division (SLED), to

testify. Stanley, who was qualified as a forensic science expert, testified that she worked as the peer reviewer for Katie Urka, the forensic scientist who performed a DNA analysis on samples taken from the scene of Porcher's death. Stanley testified about the procedures a peer reviewer follows in reviewing a DNA analyst's work. McCray objected to her testimony on the grounds that Stanley could not testify as to the results of an investigation she did not conduct. The circuit court, however, allowed Stanley to continue to testify regarding the conclusions she drew from Urka's report. At the conclusion of her testimony, Stanley testified that Porcher's blood was found on swabs from a Toyota Tacoma Truck, the ground on Jack Primus Road, and a gold Nissan Maxima.

After questioning an expert pathologist about Porcher's autopsy, the State rested and McCray moved for directed verdict. The circuit court denied McCray's motion for directed verdict.

In support of his theory of self-defense, McCray submitted Porcher's South Carolina Department of Corrections (SCDC) medical and disciplinary records into evidence and listed several witnesses who were going to testify about Porcher's past criminal history, drug use, and previous violent incidents. The State filed a motion in limine, arguing the records and testimony were inadmissible because they were irrelevant and highly prejudicial. The circuit court required McCray to proffer the evidence and testimony to rule on its admissibility.

During Lieutenant Frank Jackson's proffer, he testified he investigated Porcher in a burglary and safecracking incident that occurred in 2002. According to Jackson, Porcher was convicted of burglary, second-degree burglary as a violent offense, and safecracking after he and two others took an ATM from a convenience store. After Jackson's testimony was proffered, the circuit court denied the admission of the SCDC records and Jackson's testimony because the incidents described in the documents and the testimony were situation-specific, and neither Porcher nor McCray were near a convenience store or an ATM at the time of the homicide.

Subsequently, McCray proffered Lieutenant David Brabham's testimony. Brabham testified that he arrested Porcher in June 2000 for driving under suspension, failure to stop for a

blue light, and the unlawful carrying of a pistol. The circuit court did not admit Brabham's testimony because the incident was "not so closely connected with the homicide as to indicate the deceased's state of mind," finding no indication that the incident would cause a reasonable apprehension of great bodily harm.

Next, McCray proffered Chavis Wright's testimony. Chavis testified he was with Porcher in the Jack Primus Road area purchasing marijuana from Abdulla Fishburne the night before Porcher was killed. According to Chavis, Porcher was "very upset and very angry [and] [h]e was carrying on about the situation with [Fishburne] and [McCray] earlier that day." Chavis testified he saw Porcher pull out a handgun and fire it in the air. When asked what he learned about Porcher and McCray that evening, Chavis stated, "I learn[ed] . . . that he had animosity towards him, and he was going to retaliate on him the next day." The circuit court found Chavis's testimony about Porcher being with him when he purchased marijuana and Porcher firing a gun into the air was not relevant to Porcher's death. The circuit court also found the testimony regarding the drugs and the gun was more prejudicial than probative, noting "there is absolutely no . . . indication that they were so closely connected with the homicide as to justify their inclusion." However, the circuit court stated it would allow Chavis to testify that Porcher was upset with McCray for beating up his friend.

After Chavis testified, McCray took the stand on his own behalf to present his theory of self-defense. McCray testified about the events that led to Porcher being shot. According to McCray, on the day in question, he was riding in a car with Christopher Cleggett on Jack Primus Road when he saw Porcher's truck parked near the tree and told Cleggett to pull over because he wanted to talk to Porcher. McCray testified that he got out of the car and yelled to Porcher that he was coming to speak with him. McCray stated Porcher then ran toward his own truck, got in the driver's side door, grabbed something from under the seat, and got back out of the truck. McCray testified he believed Porcher was grabbing a weapon. In response, McCray said that he went back to the car and grabbed a shotgun. McCray stated he believed Porcher was pointing a gun at him, so he shot at Porcher.

Next, McCray testified that Porcher's truck began rolling backward and ran over Porcher's leg. McCray stated he ran toward Porcher and kicked him while he was lying on the ground in an attempt to "take the weapon off of him." McCray, however, then testified that he never saw a weapon. McCray further testified that Porcher did not appear to have been shot. However, he then stated Porcher had been shot—and that he kicked Porcher—but "nothing was wrong with him."

After closing arguments, the circuit court first charged the jury with the elements of murder. Then, because McCray argued he shot Porcher in self-defense, the circuit court charged the jury with the law regarding self-defense. In addition, the circuit court instructed the jury that "[i]f the defendant was on his own premises, the defendant has no duty to retreat before acting in self-defense." McCray objected to the circuit court's charges and requested the court charge the jury with the language from section 16–11–440(C).[2] The circuit court denied McCray's requested jury charge.

McCray was found guilty of murder and sentenced to life imprisonment. This appeal followed.

## ISSUES ON APPEAL

I. Did the circuit court err in denying McCray's request to charge the jury with the language from section 16–11–440(C)?

II. Did the circuit court err in allowing a witness to testify as an expert in DNA analysis when the expert had no independent basis for her opinion and her testimony was based upon testimonial hearsay contained in a report prepared by a nontestifying DNA analyst?

---

2. Section 16–11–440(C) states,

 A person who is not engaged in an unlawful activity and who is attacked in another place where he has a right to be, including, but not limited to, his place of business, has no duty to retreat and has the right to stand his ground and meet force with force, including deadly force, if he reasonably believes it is necessary to prevent death or great bodily injury to himself or another person or to prevent the commission of a violent crime as defined in Section 16–1–60.

III. Did the circuit court err in denying McCray's request to admit evidence and testimony regarding Porcher's criminal record, drug use, and previous violent acts?

IV. Did the circuit court err in denying McCray's request to conduct a second unlimited cross-examination of two witnesses when the State failed to provide McCray with relevant impeachment evidence in advance of his initial cross-examination of the witnesses?

## LAW/ANALYSIS

### I. Jury Charge

McCray argues the circuit court erred in denying his request to charge the jury with the language from section 16–11–440(C) because the court's self-defense charge failed to properly reflect that, as an heir to the property where the incident occurred, McCray did not have a duty to retreat. We disagree.

"In reviewing jury charges for error, this [c]ourt considers the [circuit] court's jury charge as a whole and in light of the evidence and issues presented at trial." *State v. Logan*, 405 S.C. 83, 90, 747 S.E.2d 444, 448 (2013) (citation omitted). "A jury charge is correct if, when read as a whole, the charge adequately covers the law." *Id.* at 90–91, 747 S.E.2d at 448. "Generally, the [circuit court] is required to charge only the current and correct law of South Carolina." *State v. Brown*, 362 S.C. 258, 261, 607 S.E.2d 93, 95 (Ct.App. 2004) (citation omitted). "To warrant reversal, a [circuit court]'s refusal to give a requested jury charge must be both erroneous and prejudicial to the defendant." *Id.* at 262, 607 S.E.2d at 95 (citation omitted).

The circuit court charged the jury with the self-defense instruction our supreme court adopted in *State v. Davis*, 282 S.C. 45, 317 S.E.2d 452 (1984). In *Davis*, our supreme court suggested the circuit court use the following instruction when the facts indicate a self-defense charge is appropriate:

Self-defense is a complete defense. If established, you must find the defendant not guilty. There are four elements required by law to establish self-defense in this case. First, the defendant must be without fault in bringing on the difficulty. Second, the defendant must have actually be-

lieved he was in imminent danger of losing his life or sustaining serious bodily injury, or he actually was in such imminent danger. Third, if his defense is based upon his belief of imminent danger, a reasonably prudent man of ordinary firmness and courage would have entertained the same belief. If the defendant actually was in imminent danger, the circumstances were such as would warrant a man of ordinary prudence, firmness and courage to strike the fatal blow in order to save himself from serious bodily harm or losing his own life. Fourth, the defendant had no other probable means of avoiding the danger of losing his own life or sustaining serious bodily injury than to act as he did in this particular instance. If, however, the defendant was on his own premises he had no duty to retreat before acting in self-defense. These are the elements of self-defense.

*Id.* at 46, 317 S.E.2d at 453.

■ While we recognize the jury instruction in *Davis* is not an exclusive charge, additional elements may be included with a self-defense charge if the facts and circumstances of the case support their addition. *See State v. Fuller*, 297 S.C. 440, 443, 377 S.E.2d 328, 330 (1989) (holding it was error for the circuit court to charge the *Davis* instruction as an exclusive self-defense charge when the facts and circumstances necessitated the circuit court charge additional elements that were requested by the defendant); *see also State v. Nichols*, 325 S.C. 111, 116–17, 481 S.E.2d 118, 121 (1997) (finding the evidence supported including additional instructions on (1) "the right to act on appearances," (2) "relevance of prior difficulties," and (3) "that a person does not have to wait before acting in self-defense").

■ In the instant case, the facts and circumstances do not necessitate self-defense instructions in excess of the *Davis* instruction. A review of the record shows that McCray arrived at the area near the tree, exited his vehicle, yelled something at Porcher, and then fired his shotgun at Porcher. After shooting Porcher, McCray approached Porcher, kicked him, and yelled "die mother-f* * *er, die." Accordingly, based on the facts and circumstances of this case, we find the circuit court charged the correct law and did not err in

denying McCray's request to charge the jury with the language from section 16–11–440(C).

## II. DNA Expert Testimony

Next, McCray argues the circuit court erred in allowing an expert witness to testify when she had no independent basis for her opinion and her testimony was based upon testimonial hearsay contained in a report prepared by a nontestifying DNA analyst. We agree; however, we find this error was harmless.

■ "The admission or exclusion of evidence is a matter addressed to the sound discretion of the [circuit] court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice." *State v. Douglas*, 369 S.C. 424, 429, 632 S.E.2d 845, 847–48 (2006) (citation omitted).

■ The Sixth Amendment's Confrontation Clause guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the U.S. Supreme Court held the admission of testimonial hearsay against an accused violates the Confrontation Clause if (1) the declarant is unavailable to testify at trial and (2) the accused has had no prior opportunity to cross-examine the declarant. 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "The touchstone for determining whether an expert is giving an independent judgment or merely acting as a transmitter for testimonial hearsay is whether an expert is applying his training and expertise to the sources before him, thereby producing an original product that can be tested through cross-examination." *United States v. Palacios*, 677 F.3d 234, 243 (4th Cir.2012) (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir.2009)) (internal quotation marks omitted).

■ This issue hinges on whether Stanley—a DNA analysis expert who peer reviewed another DNA expert's report—merely served as a conduit for introducing the results of DNA tests that were performed by an expert who did not testify. After a thorough review of the record, we find Stanley did not

offer any independent opinions regarding the results of the tests or produce an original product that could be tested through cross-examination. Specifically, during cross-examination, Stanley stated, "I did not perform DNA analysis in this case.... My job was as a peer reviewer." Additionally, Stanley stated she was not present when the tests were conducted. Stanley's statement that the DNA swabs from the scene matched Porcher's DNA appears to be based solely on Urka's tests; therefore, we find Stanley merely served as a conduit to introduce the results of Urka's DNA tests. Accordingly, the circuit court's admission of Stanley's testimony violated McCray's rights under the Confrontation Clause.

 "A violation of [a] defendant's Sixth Amendment right to confront [a] witness is not *per se* reversible error if the error was harmless beyond a reasonable doubt." *State v. Pradubsri,* 403 S.C. 270, 280, 743 S.E.2d 98, 104 (Ct.App.2013) (citation omitted).

> Whether such an error is harmless in a particular case depends upon a host of factors.... These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*State v. Gracely,* 399 S.C. 363, 375, 731 S.E.2d 880, 886 (2012) (alteration in original) (emphasis omitted) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

 We find Stanley's testimony to be of minimal importance to the State's case. Stanley's testimony that Porcher's DNA matched the DNA recovered from the scene merely proves Porcher—whom McCray admittedly shot and kicked—was bleeding after being shot and kicked by McCray. Although Stanley's testimony was contradicted by McCray's testimony that Porcher was not bleeding after being shot and kicked, we find this contradiction to be insignificant when considering the overwhelming evidence of McCray's guilt. Accordingly, we find it is clear beyond a reasonable doubt that the admission of Stanley's testimony was harmless.

### III. Prior Bad Acts

McCray argues the circuit court erred in denying his request to admit evidence of Porcher's criminal record, drug use, and previous violent acts through the admission of Porcher's SCDC records and the testimonies of Father, Jackson, Brabham, and Chavis. We disagree.

"The admission or exclusion of evidence is left to the sound discretion of the [circuit court], whose decision will not be reversed on appeal absent an abuse of discretion" or the commission of a legal error resulting in prejudice to the defendant. *State v. Martucci*, 380 S.C. 232, 247, 669 S.E.2d 598, 606 (2008) (citations omitted). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *Id.* (citation omitted).

Rule 402 of the South Carolina Rules of Evidence states "[a]ll relevant evidence is admissible...." Rule 404 of the South Carolina Rules of Evidence states the following:

(a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

. . .

(2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent.

"It is firmly established that otherwise inadmissible evidence may be properly admitted when opposing counsel opens the door to that evidence." *State v. Page*, 378 S.C. 476, 482, 663 S.E.2d 357, 360 (Ct.App.2008) (citing *State v. Young*, 364 S.C. 476, 485, 613 S.E.2d 386, 391 (Ct.App.2005)). "Whether a

person opens the door to the admission of otherwise inadmissible evidence during the course of a trial is addressed to the sound discretion of the [circuit court]." *Id.* at 483, 663 S.E.2d at 360 (citation omitted).

## A. Robert Porcher Jr.

 McCray argues the circuit court erred in denying the admission of Father's testimony regarding Porcher's arrests and prior bad acts because Father's testimony became relevant once he put his son's purported good character at issue through his statements about a potential football career. We disagree.

We find Father's testimony regarding Porcher's ability to play football was not evidence of Porcher's good character. Rather, Father's testimony was an explanation of Porcher's physical limitations that was relevant in light of McCray's testimony regarding Porcher's movement during the altercation. We find the circuit court did not abuse its discretion in determining that Father's testimony did not open the door for additional prior bad act evidence. Accordingly, we affirm the circuit court's denial of the admission of Father's testimony regarding Porcher's prior bad acts.

## B. SCDC Records

 McCray argues the proffered SCDC records were admissible because the medical examiner's testimony about Porcher's toxicology report—which stated Porcher had marijuana metabolites in his system at the time of his death—opened the door for the admission of evidence of prior drug use. We disagree.

"As a general rule, if an issue was not raised and ruled upon below, it will not be considered for the first time on appeal." *State v. Santiago,* 370 S.C. 153, 163, 634 S.E.2d 23, 28 (Ct.App. 2006) (citation omitted). At trial, McCray did not argue the State's use of the toxicology report opened the door for the admission of the SCDC records.[3] Therefore, we find this

---

**3.** Instead, McCray argued the medical examiner's testimony opened the door for Chavis to testify about marijuana. The circuit court, however, did not rule on this argument when it was initially raised and, after

argument is not preserved for appellate review because it was not raised to or ruled upon by the circuit court.

## C. Testimonies of Lt. Frank Jackson and Lt. David Brabham

 McCray argues the testimonies of Jackson and Brabham were admissible because the specific incidents described were so closely connected to the homicide as to reasonably indicate Porcher's state of mind. We disagree.

> The rule has long been established in this State that evidence of other specific instances of violence on the part of the deceased are not admissible unless they were directed against the defendant, or, if directed against others, were so closely connected in point of time or occasion with the homicide as reasonably to indicate the state of mind of the deceased at the time of the homicide. . . .

*State v. Amburgey*, 206 S.C. 426, 429, 34 S.E.2d 779, 780 (1945) (citation omitted).

Based on our review of the record, we find the State did not open the door to testimony regarding Porcher's violent past and agree with the circuit court's conclusion that Jackson and Brabham's testimonies were situation-specific and unrelated to Porcher's state of mind at the time of the homicide. Accordingly, we find the circuit court properly denied the admission of the officers' testimonies.

## D. Chavis Wright's Testimony

 McCray argues the circuit court erred in finding Chavis's testimony regarding the night before Porcher's death, as well as his mention of Porcher's drug use and use of a gun, were irrelevant. McCray contends the evidence was relevant because the close temporal relationship with Porcher's death goes toward McCray's state of mind at the time of the murder. We disagree.

> In the murder prosecution of one pleading self-defense against an attack by the deceased, evidence of other specific instances of violence on the part of the deceased are not

---

Chavis's testimony was proffered, the court denied the admission of his testimony regarding drug use on other grounds.

admissible unless they were directed against the defendant or, if directed against others, were so closely connected at the point of time or occasion with the homicide as to reasonably indicate the state of mind of the deceased at the time of the homicide, or to produce reasonable apprehension of great bodily harm.

*State v. Day*, 341 S.C. 410, 419–20, 535 S.E.2d 431, 436 (2000) (citations omitted).

We agree with the State that Chavis's testimony about Porcher firing the gun the night before the incident was not so closely connected to the homicide to allow for its admission because, at the time of the homicide, no gun was found and no evidence was produced to show McCray was aware of Porcher's behavior the night before. Furthermore, upon review of the record, we find no evidence that McCray had a reasonable apprehension of great bodily harm based on Chavis's testimony. Accordingly, we find the circuit court properly denied the admission of Chavis's testimony regarding Porcher's brandishing and firing a weapon the night before the homicide.

## IV. Due Process

Finally, McCray argues the circuit court erred in denying his request to conduct a second unlimited cross-examination of Coaxum and Joyce because the State's failure to provide their prior criminal records violated his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.

"The *Brady* disclosure rule requires the prosecution to provide the defendant with any evidence in the prosecution's possession that may be favorable to the accused and material to guilt or punishment." *State v. Anderson*, 407 S.C. 278, 286, 754 S.E.2d 905, 909 (Ct.App.2014) (citing *Hyman v. State*, 397 S.C. 35, 45, 723 S.E.2d 375, 380 (2012)). The State has the duty to disclose evidence even in the absence of a request by the accused. *Id.* at 287, 754 S.E.2d at 909 (citing *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

"[A]n individual asserting a *Brady* violation must demonstrate the evidence was (1) favorable to the accused; (2) in the possession of or known by the prosecution; (3) sup-

pressed by the State; and (4) material to the accused's guilt or innocence, or was impeaching." *Id.* (citing *Kyles v. Whitley,* 514 U.S. 419, 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). "Favorable evidence is either favorable exculpatory evidence or favorable impeachment evidence." *Id.* (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "Materiality of evidence is determined based on the reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense." *Hyman,* 397 S.C. at 45, 723 S.E.2d at 380 (quoting *Porter v. State,* 368 S.C. 378, 384, 629 S.E.2d 353, 356 (2006)). "[I]nformation is not deemed 'material' if the defense discovers the information in time to adequately use it at trial." *State v. Kennerly,* 331 S.C. 442, 453, 503 S.E.2d 214, 220 (Ct.App.1998). "A reasonable probability is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Anderson,* 407 S.C. at 287, 754 S.E.2d at 909 (citing *Hyman,* 397 S.C. at 45–46, 723 S.E.2d at 380).

In the instant case, Coaxum's and Joyce's prior convictions both related to dishonesty and, pursuant to Rule 609 of the South Carolina Rules of Evidence, these prior convictions were admissible as impeachment evidence. *See* Rule 609(a)(2), SCRE ("[E]vidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment."). We find the impeachment evidence was favorable to McCray. *See Anderson,* 407 S.C. at 287, 754 S.E.2d at 909 (noting impeachment evidence is favorable).

We further find the evidence was in the State's possession and was suppressed by the State. During the trial, the State admitted that the failure to turn over the documents until after the witnesses testified was an oversight. The State apologized for this error and stated it did not purposely suppress the evidence. Regardless of whether the State intended to suppress the evidence, we find the State was in possession of the evidence and its failure to give McCray the evidence satisfies the second and third *Brady* requirements.

Although the evidence was favorable impeachment evidence, in the State's possession, and suppressed by the State, we find no *Brady* violation occurred because the evidence was not

material as defined by the fourth *Brady* element. *See Hyman,* 397 S.C. at 45, 723 S.E.2d at 380 ("Materiality of evidence is determined based on the reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense." (citation omitted)). The evidence was not material because the State produced testimony from multiple witnesses corroborating Coaxum's and Joyce's testimony. Specifically, Boykin's testimony—that McCray said he "shot that mother-f* * *er" and, as he was standing over Porcher, spit in Porcher's face and said "die mother-f* * *er, die"—provides support for the conclusion that any discrediting of the witnesses' testimonies would have been minimal. Additionally, Ashby's testimony corroborated Coaxum's, Joyce's, and Boykin's testimony. Therefore, we find the proceeding would not have been different had the evidence been disclosed to the defense prior to the initial cross-examination.

Accordingly, based on the significant amount of corroborating testimony, we find the suppressed evidence was not material and the State's suppression of the witnesses' criminal records did not violate the *Brady* disclosure rule.

## CONCLUSION

Based on the forgoing, the circuit court's decision is

**AFFIRMED.**

GEATHERS and McDONALD, JJ., concur.